Agnes DeLEON, Plaintiff,

v.

Sandra E. LITTLE and City of Hartford, Defendants.

Civil No. 3:94CV902 (RNC).

United States District Court, D. Connecticut.

June, 5, 1997.

C. Thomas Furniss, James M. Quinn, Furniss & Quinn, Hartford, CT, Anne Kelly Zovas, Pomeranz, Drayton & Stabnick, Glastonbury, CT, for plaintiff.

Joseph A. Moniz, John B. Ashmeade, Marquis D. Jones, Jr., Day, Berry & Howard, Cityplace, Hartford, CT, Thomas F. Kelsey, Duburg & Deganis, Glastonbury, CT, Margaret J. Strange, Jackson, Lewis, Schnitzler & Krupman, Hartford, CT, Linda L. Yoder, John W. Mahoney, Charles L. Howard, Shipman & Goodwin, Hartford, CT, Margaret E. Corrigan, Lucas D. Strunk, Pomeranz, Drayton & Stabnick, Stephen J. Courney, Gesmonde, Pietresimone, Sgrignari, Pinkus & Sachs, New Haven, CT, for defendants.

CHATIGNY, District Judge.

After review and over objection, the Magistrate Judge's recommended ruling is hereby approved and adopted. So ordered.

### RECOMMENDED RULING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

SMITH, United States Magistrate Judge.

Plaintiff seeks damages from defendants for alleged violations of her civil rights pur-

suant to 42 U.S.C. § 1983 and intentional infliction of emotional distress in violation of Connecticut common law. Defendants each move for summary judgment on their respective counts of the Complaint. For the reasons that follow, Defendant Little's motion should be granted in part and denied in part; Defendant City of Hartford's motion should be granted.

## FACTS

Plaintiff Agnes DeLeon ("DeLeon") began her employment with the City of Hartford as a clerical employee in City Hall on December 2, 1985. On January 4, 1988, DeLeon transferred from a Senior Clerk Typist position in the Personnel Department to a Senior Clerk Typist position in the Court of the Common Council's ("City Council") office for the political party "People for Change" ("PFC"), which had won two seats on the City Council in the November 1987 election. On May 13, 1988, DeLeon became an Administrative Clerk for PFC, and on January 17, 1989, she was promoted to an Administrative Assistant.

As an Administrative Assistant, Plaintiff engaged in constituent services and provided office and secretarial support for the PFC Council members. The two PFC council members with whom Plaintiff initially worked were Eugenio Caro ("Caro") and Marie Kirkley–Bey ("Kirkley–Bey"). Defendant Sandra Little ("Little") won a council seat as a member of PFC in the November 1989 election, replacing Kirkley–Bey.

On June 5, 1992, DeLeon suffered a psychiatric episode (referred to by all parties as a "nervous breakdown") at work, during which she threw furniture from the third-floor office in which she worked to the atrium floor below. Plaintiff was restrained by police officers called to the scene, taken via ambulance to Hartford Hospital, and admitted for recurrent major depression. DeLeon was discharged from the Hospital on June 7, 1992, but remained under the care of a psychiatrist thereafter.

After an extended disability leave, Plaintiff returned to work for the City of Hartford in December, 1992. Advised by her physician not to return to her prior position, DeLeon was transferred to work as an Administrative Assistant in the Department of Social Services. She has worked continually in this capacity since that date.

Plaintiff alleges generally that Little's cruel and abusive treatment as her supervisor caused DeLeon's breakdown. Specifically, DeLeon alleges that Little: displayed in the workplace an openly hostile attitude towards her; openly and repeatedly criticized her work; intimidated and threatened her job security; criticized her attendance record; required her to obtain written excuses from a physician for absences from work; criticized and humiliated her before others; harassed her at home regarding work; showed animosity towards her as a result of her racial and ethnic status and political affiliation; threatened to replace her with a member of another race; compelled her to perform personal errands and to work for her private employer; compelled her to purchase illegal drugs; and made her stand guard while Little used drugs.

Counts One and Two of Plaintiff's four-count Complaint allege that Little's treatment of her in the workplace violated rights secured to her by the First, Fifth, Ninth and Fourteenth Amendments of the United States Constitution. Specifically, these rights include Plaintiff's alleged rights to be free from interference in the pursuit of her occupation, free from emotional and criminal harassment in the workplace, free from racial discrimination in the workplace, and free from interference with her personal liberties. In addition, Counts Three and Four allege that Little's treatment constituted intentional infliction of emotional distress under Connecticut common law.

Counts One and Three of Plaintiff's Complaint are addressed to Defendant Little in her individual and official capacity as a former Hartford City Councilor. Counts Two and Four also seek to hold the City of Hartford, acting through its elected officials, liable for the alleged constitutional and common law violations. Defendants each move for summary judgment on their respective counts of the Complaint.

## STANDARD

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). A dispute regarding a material fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510), *cert. denied*, 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich*, 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir.1992).

## DISCUSSION

As Defendants have moved for summary judgment on substantially different grounds, the court will address each motion individually.

### I. Defendant Little

In support of her motion for summary judgment, Little argues that: (1) Plaintiff cannot support a First, Fifth, Ninth or Fourteenth Amendment claim under § 1983; (2) the doctrine of qualified immunity shields her from any liability; and (3) the Complaint fails to allege conduct egregious enough to sustain a cause of action for intentional infliction of emotional distress. Some, though not all, of these arguments have merit.

#### A. First Amendment Violation

Plaintiff claims that her First Amendment rights were violated when she was pressured to involve herself with the political activities of the PFC party, when she was harassed by Defendant due to her political affiliation, and when she was discouraged from filing grievances over her ill treatment at work by her supervisors, one of whom was Defendant Little. Defendant argues that none of these alleged actions resulted in deprivation of Plaintiff's First Amendment rights. While the court finds no First Amendment violation with respect to Plaintiff's attempts at filing grievances, there remain genuine issues of material fact regarding Plaintiff's First Amendment claims based upon political affiliation.

With regard to her attempts at filing grievances, Plaintiff alleges that on at least two occasions she inquired about voicing a grievance concerning her ill treatment at work, and on both occasions she was discouraged from filing a formal grievance. The first incident occurred on June 26, 1989, after she had complained to Kirkley–Bey regarding problems she had been having working with Caro, the other councilperson in PFC at the time (Defendant Little had not yet been elected councilperson). In response to her complaint, Kirkley–Bey convened a meeting at City Hall on June 26, 1989, with the Plaintiff, Caro, and several leaders of the PFC party in an attempt to mediate the problem. At that meeting, Kirkley–Bey urged Plaintiff not to file a formal grievance against Caro because of the potential political implications. No formal grievance was filed.

The second incident during which Plaintiff was discouraged from filing a grievance against her supervisor, this time the Defendant, occurred during the winter and spring of 1992. During this time Plaintiff approached colleagues and City officials with complaints regarding Defendant, only to be discouraged again from filing a grievance with the personnel department. Once again, Plaintiff failed to file a formal grievance.

While these incidents may be troubling, they do not support a First Amendment claim against Little because in neither case did Defendant personally discourage Plaintiff from exercising her First Amendment peti-

tion rights.[1] The first incident occurred months before Little was a councilperson. The second incident, while during Little's tenure, does not support Plaintiff's First Amendment claim against Defendant because there is no allegation that Little herself suggested directly or indirectly that DeLeon should not file a grievance. The court therefore finds that Defendant did not violate Plaintiff's First Amendment rights with regard to Plaintiff's attempts at filing grievances, and grants summary judgment in favor of Defendant as to these claims.

■ Plaintiff further asserts that Little violated her First Amendment rights by pressuring her to involve herself with the political activities of the PFC party, of which Plaintiff was not a member,[2] and subjecting her to a campaign of harassment, both in and away from the workplace, as a result of her political affiliation. Defendant argues that this claim must fail because there is no showing of specific conduct by Defendant which deprived Plaintiff of her right to political expression or neutrality. Despite the fact that Plaintiff was not fired from her job or formally threatened with such action, her Complaint alleges other incidents which may have sufficiently served to chill the exercise of her First Amendment rights to withstand a motion for summary judgment.

■ Political neutrality is protected by the First Amendment. *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 76, 110 S.Ct. 2729, 2738, 111 L.Ed.2d 52 (1990). Moreover, the Supreme Court has stated that the threat of dismissal for failure to provide support for the favored political party "unquestionably inhibits protected belief and association." *Elrod v. Burns*, 427 U.S. 347, 359, 96 S.Ct. 2673, 2683, 49 L.Ed.2d 547 (1976) (plurality opinion). This reasoning has been extended to apply to the use of political considerations in the hiring, rehiring, transferring, and promoting of public employees. *Rutan*, 497 U.S. at 75, 110 S.Ct. at 2737. Thus, "[w]here ... important conditions of employment are involved, a public employee will not be foreclosed from § 1983 relief merely because the impermissible retaliation did not result in the termination of his employment." *Bickel v. Burkhart*, 632 F.2d 1251, 1255 n. 6 (5th Cir. 1980).

Plaintiff asserts she feared for the loss of her job if she failed to comply with Defendant's political requests. At the very least, she alleges she was continually harassed by Defendant for her political affiliation, potentially limiting her advancement possibilities. Such activities could serve to chill Plaintiff's exercise of her First Amendment rights. *See Rutan*, 497 U.S. at 73, 110 S.Ct. at 2736 (employees who find themselves in dead-end positions due to their political backgrounds are adversely affected in such a way as to chill the exercise of protected belief and association); *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir.1982) (the exercise of First Amendment rights by public employees may be deterred by subjecting employees who exercise them to harassment and ridicule)[3]. De-

---

1. Moreover, the court notes without deciding that the rule in the Second Circuit appears to be that a public employee is not afforded First Amendment protection for filing a petition or grievance for matters of private concern (e.g., an employee's complaints over internal office affairs). *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1058–60 (2d Cir.), *cert. denied*, 510 U.S. 865, 114 S.Ct. 185, 126 L.Ed.2d 144 (1993); see also *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983) ("[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.").

2. Plaintiff alleges she was told by Defendant that she must attend PFC meetings which were held after work hours, that she must participate in fund raising activities for the Party, and that the Party was questioning her loyalty due to her failure to perform these activities. In addition, Plaintiff claims that Defendant desired to change DeLeon's job status from classified (i.e., covered under the City's personnel policies and procedures) to unclassified (i.e., political appointees who are not entitled to **civil service protections**).

3. Defendant asserts that the alleged harassment is trivial and would not deter an employee from holding or expressing beliefs. See *Wallace v. Benware*, 67 F.3d 655, 663 (7th Cir.1995). *But cf. Bart*, 677 F.2d at 625 ("The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order

fendant's motion for summary judgment with regard to the First Amendment claims based upon political affiliation must, therefore, be denied.

## B. Fifth Amendment Violation

In her Complaint, Plaintiff alleges she was also deprived of rights secured to her under the Fifth Amendment of the United States Constitution. Defendant has established that Plaintiff's Fifth Amendment claim must fail because she does not allege any involvement by a federal agent. Additionally, Plaintiff would appear to concede this point, as she fails to rebut this argument in either her opposition or response brief. The court therefore grants *summary* judgment in favor of Defendant with regard to Plaintiff's claims under the Fifth Amendment.

## C. Ninth Amendment Violation

■ Plaintiff also alleges in her Complaint that she was deprived of rights secured to her under the Ninth Amendment. Defendant moves for summary judgment on this claim due to Plaintiff's failure to allege any specific right to sustain a § 1983 action pursuant to the Ninth Amendment. Plaintiff, appearing once again to concede, fails to respond to Defendant Little's argument. More importantly, it has been held that "the [Ninth Amendment] does not guarantee any constitutional right sufficient to support a claim under 42 U.S.C. § 1983." *In re State Police Litig.*, 888 F.Supp. 1235, 1258 (D.Conn.1995) (citations omitted), *appeal dismissed*, 88 F.3d 127 (2d Cir.1996). Accordingly, the court grants summary judgment in favor of Defendant with regard to Plaintiff's claims under the Ninth Amendment.

## D. Fourteenth Amendment Violation

Plaintiff further claims that Little's conduct violated her due process rights under the Fourteenth Amendment. Defendant argues that the alleged conduct is insufficient to sustain such a claim on either procedural or substantive due process grounds. While the facts of this case, if true, are certainly

troubling, the court agrees that they do not rise to the level of a constitutional violation on due process grounds.

Due process claims may take either of two forms: procedural due process or substantive due process. Procedural due process claims concern the adequacy of the procedure provided by the governmental body for the protection of liberty or property rights of an individual. Substantive due process claims, on the other hand, concern limits on governmental conduct toward an individual regardless of procedural protections. *Pittsley v. Warish*, 927 F.2d 3, 6 (1st Cir.) (citing *Monroe v. Pape*, 365 U.S. 167, 171–72, 81 S.Ct. 473, 475–76, 5 L.Ed.2d 492 (1961); *Rochin v. California*, 342 U.S. 165, 169, 72 S.Ct. 205, 208, 96 L.Ed. 183 (1952)), *cert. denied*, 502 U.S. 879, 112 S.Ct. 226, 116 L.Ed.2d 183 (1991). Plaintiff alleges both procedural and substantive due process violations.

The Supreme Court has enunciated two alternative tests by which substantive due process is examined. Under the first test, the plaintiff must prove that the governmental body's conduct "shocks the conscience." *Pittsley*, 927 F.2d at 6 (citing *Rochin*, 342 U.S. at 172–73, 72 S.Ct. at 209–10). Under the second test, the plaintiff must demonstrate a violation of an identified liberty or property interest protected by the Due Process Clause. *Id.* (citing *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626–27, 67 L.Ed. 1042 (1923)). Plaintiff fails to satisfy her burden of proving a substantive due process violation under either test.

■ Under the first test, the alleged conduct is not sufficiently egregious as to "shock the conscience." The substantive due process doctrine is to be applied with "caution and restraint." *Moore v. City of East Cleveland*, 431 U.S. 494, 502, 97 S.Ct. 1932, 1937, 52 L.Ed.2d 531 (1977) (plurality opinion, Powell, J.). Moreover, the Second Circuit has noted with regard to *Rochin's* "shocks the conscience" test that "[t]he acts must do more than 'offend some fastidious squeamishness or private sentimentalism ...;' they

to be actionable."). Whether this is the case remains a question of fact to be determined at

trial.

must be such as 'to offend even hardened sensibilities,' or constitute force that is 'brutal' and 'offensive to human dignity.'" *Johnson v. Glick*, 481 F.2d 1028, 1033 n. 6 (2d Cir.) (quoting *Rochin*, 342 U.S. at 172–74, 72 S.Ct. at 209–11), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

Plaintiff alleges in her Complaint that Defendant exhibited a hostile attitude toward her, intimidated and threatened her, harassed her at home and at work, and compelled her to aid in Defendant's alleged drug use. Defendant's verbal harassment, while offensive, cannot be said to "shock the conscience." *See Santiago de Castro v. Morales Medina*, 943 F.2d 129, 130–32 (1st Cir.1991) (supervisor's extensive criticism and defamation of teacher, though resulting in teacher suffering from anxiety disorder with depressive characteristics, not "conscience shocking"). With regard to Defendant's alleged requests that Plaintiff purchase drugs for her and stand guard while she used the drugs, this conduct also fails to "shock the conscience" as there is no evidence that Defendant threatened Plaintiff with physical violence or the loss of her job if she failed to comply.[4]

█ Under the second substantive due process test, Plaintiff fails to demonstrate that Defendant's conduct deprived her of a specific constitutionally guaranteed property right or liberty interest. While she may have had a constitutionally protected property right in her continued employment,[5] she was not deprived of this alleged right because she was neither actually nor constructively discharged from her employment. Plaintiff was not fired or forced to resign from employment with the City of Hartford; upon her return from disability leave, she was transferred to a position with the same pay and benefit levels in an office away from City Hall at her request. Such an employment decision does not constitute a deprivation of a property interest under the Fourteenth Amendment. *See Oladeinde v. City of Birmingham*, 963 F.2d 1481, 1486 (11th Cir.1992) (transfer, which involves no loss of pay and no loss of rank, does not deprive a plaintiff of a protected property interest), *cert. denied*, 507 U.S. 987, 113 S.Ct. 1586, 123 L.Ed.2d 153 (1993); *Rode v. Dellarciprete*, 845 F.2d 1195, 1205 (3d Cir.1988) Defendant's specific requests. (employment decisions which do not terminate or abridge the employment contract and which could be litigated in state tribunals do not constitute deprivations of property interests under the Fourteenth Amendment). At least two decisions in this District support this view. *See*

---

**4.** Despite Plaintiff's fear that she would be fired for noncompliance, her deposition makes clear that Defendant never verbally threatened Plaintiff that her failure to comply with a specific request would automatically cost Plaintiff her job:

A. [Before the break, w]e had discussed an area where [my lawyer] stated [in the Complaint] that every time that Sandra Little asked me to do something, that she would threaten me with saying, "You're going to get fired." *And she wasn't actually saying, "You are going to get fired."* What she was saying was that, you know, "I'm not happy with your work, and I'm not content with the type of work you're putting out for me." And that to me was an indication that I was—I would get fired.

Q. Okay. Is what you're saying now: she never said to you in words to the effect that if you don't do something, you'll lose your job?

A. *She didn't say I'm going to fire you tomorrow.* Pl.'s Dep. at 457–458 (emphasis added).

Later in the deposition, Plaintiff revised her story, claiming that Defendant became more direct in her threats toward the end of Plaintiff's employment with Defendant. *See* Pl.'s Dep. at 458–60. This subsequent testimony, given after consultation with her lawyer and with the lawyer's involvement therein, fails to override the majority of the testimony in Plaintiff's deposition which clearly indicates that Defendant never threatened Plaintiff with the loss of her job as a result of Plaintiff's failure to comply with

**5.** *See Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) (property interests may be protected by *procedural* due process where the interest is derived from state law rather than the Constitution) (emphasis added). The court notes that *Roth* is a procedural due process case, and expresses doubt over whether there is a corresponding substantive due process right to continued employment. *See Albright v. Oliver*, 510 U.S. 266, 272, 114 S.Ct. 807, 812, 127 L.Ed.2d 114 (1994) ("The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity."). The court does not reach this issue however, as Plaintiff was not deprived of her alleged right to continued employment, thereby resulting in no constitutional violation.

*Wargat v. Long,* 590 F.Supp. 1213, 1215 (D.Conn.1984) ("personnel decisions short of termination do not constitute a deprivation of a property interest under the due process clause of the fourteenth amendment [sic]"); *Glaski v. Connecticut Dep't of Admin. Servs.,* No. H–86–929 (JAC), slip op. (D. Conn. April 11, 1991) (following *Wargat).* Therefore, Plaintiff was not deprived of a constitutionally protected property interest.

■ Neither was Plaintiff deprived of a constitutionally protected liberty interest. Plaintiff's claimed liberty interest in her emotional well-being is not recognized under the Fourteenth Amendment. *See Pittsley,* 927 F.2d at 7 ("Fear or emotional injury which results solely from verbal harassment or idle threats is generally not sufficient to constitute an invasion of an identified liberty interest."). The First Circuit Court of Appeals has responded to a similar claim:

> We have discovered no direct or analogous support for appellant's contention that, important as it is, her right to pursue her employment free from emotional health risks resulting from her supervisor's verbal harassment warrants substantive due process protection under the United States Constitution.

*Santiago de Castro,* 943 F.2d at 131. Thus, Plaintiff was not deprived of a constitutionally protected liberty interest.

As Plaintiff was neither deprived of a constitutionally protected property or liberty interest, nor was she subject to actions which "shock the conscience," the court is unable to find evidence of a substantive due process violation. Summary judgment in favor of Defendant must, therefore, be granted with regard to Plaintiff's substantive due process claim.

Finally, Plaintiff's procedural due process claim must also fail. As previously explained, while she may have had a property interest in continued employment protected by procedural due process, Plaintiff was not deprived of this right because she was neither actually nor constructively discharged from her employment. Thus, there was no

procedural due process violation, and summary judgment in favor of Defendant must issue with regard to Plaintiff's procedural due process claim.

Defendant's motion for summary judgment with regard to Plaintiff's due process claims under the Fourteenth Amendment is therefore granted.[6]

**E. Qualified Immunity**

■ As Plaintiff brings this action against Defendant in her personal as well as official capacity, Defendant is entitled to assert the defense of qualified immunity for the remaining constitutional claim—Defendant's alleged violation of Plaintiff's First Amendment rights in pressuring Plaintiff to involve herself with the political activities of the PFC party and harassing Plaintiff as a result of her political affiliation. *Cartier v. Lussier,* 955 F.2d 841, 844 (2d Cir.1992). Qualified immunity protects government officials from civil suits arising from the performance of their discretionary functions when their conduct " 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Id.* at 843 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Qualified immunity "serves not only as a defense from liability, but also to spare public officials from shouldering the burdens and expense of litigation," and the Supreme Court has expressly encouraged the use of summary judgment when such a defense is raised. *Id.* at 844.

Defendant argues that the doctrine of qualified immunity shields her from liability because Plaintiff cannot show that Defendant's alleged conduct violated any clearly established constitutional rights, or in the alternative, a reasonable government official would not know, or reasonably have known, that these rights were violated because of the nature of Plaintiff's job as a PFC Administrative Assistant. Neither of these arguments is availing.

It was clearly established during the contested time period that an employee is enti-

---

6. To the extent that it may have been pled, the court does not address the merits of an equal protection claim under the Fourteenth Amendment because neither party has briefed the issue.

tled to political neutrality, and any impermissible retaliation due to the employee's political affiliation violates the employee's First Amendment rights. *See Rutan v. Republican Party of Ill.,* 497 U.S. 62, 75, 110 S.Ct. 2729, 2737, 111 L.Ed.2d 52 (1990) (the use of political considerations in the hiring, rehiring, transferring, and promoting of public employees violates First Amendment); *Elrod v. Burns,* 427 U.S. 347, 359, 96 S.Ct. 2673, 2682–83, 49 L.Ed.2d 547 (1976) (threat of dismissal for failure to support favored political party infringes upon First Amendment rights); *Donahue v. Windsor Locks Bd. of Fire Com'rs,* 834 F.2d 54, 58–59 (2d Cir.1987) (material fact issues as to whether fire fighter's public challenges of firehouse practices evoked prolonged harassment from defendants precluded summary judgment on plaintiff's First Amendment claim). Thus, if Defendant inhibited Plaintiff's promotional opportunities or harassed her for failing to support the PFC party in such a way as to chill Plaintiff's exercise of her First Amendment rights, Defendant was clearly on unconstitutional grounds.

As to whether Defendant could reasonably have known she was violating Plaintiff's constitutional rights, there remain material issues of fact in dispute on this point. It is unclear whether Defendant's treatment of Plaintiff was a result of her general dissatisfaction with Plaintiff's job performance or whether it was, in fact, politically motivated. While it may be objectively reasonable for an employer to voice dissatisfaction with an employee's work, *Natale v. Town of Ridgefield,* 927 F.2d 101, 104–105 (2d Cir.1991) (reversing district court's denial of summary judgment, noting that immunity issues turn on whether "it is objectively reasonable for an official to believe that he or she is acting within constitutional and statutory bounds" and finding that official had a reasonable belief that Town had discretion to deny plaintiff's application for a zoning permit), it is impermissible to use such an explanation to excuse a veiled attempt to replace an employee with another of a favored political party. Therefore, the defense of qualified immunity fails to shield Defendant from liability for the remaining First Amendment violations at this time, and Defendant's motion for summary judgment with regard to this claim must be denied.

## F. Intentional Infliction of Emotional Distress

■ Count Three of Plaintiff's Complaint alleges the tort of intentional infliction of emotional distress.[7] Defendant argues this claim must fail because Plaintiff fails to show conduct egregious enough to sustain such a cause of action or that Defendant's conduct was the cause of Plaintiff's distress. Because the court finds the alleged conduct was not sufficiently extreme and outrageous to sustain a cause of action for intentional infliction of emotional distress, it does not address Defendant's second contention regarding the cause of Plaintiff's distress.

■ Whether conduct is extreme and outrageous is a determination for this court to make in the first instance. *Scandura v. Friendly Ice Cream Corp.,* No. CV 930529109S, 1996 WL 409337, at *2 (Conn.Super.Ct. June 26, 1996); *Diemond v. American Red Cross,* No. CV 940533021, 1995 WL 12501, at *2 (Conn.Super.Ct. Jan.5, 1995). The court in *Mellaly v. Eastman Kodak Co.,* 42 Conn.Supp. 17, 597 A.2d 846 (1991), offers a useful description of the "extreme and outrageous" standard:

> Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress. "So far as it is possible to generalize from the cases, the rule which seems to have emerged is that there is liability for conduct exceeding all bounds usually tolerated by decent society, of a

---

**7.** The elements required to prove a cause of action for intentional infliction of emotional distress are: (1) that the actor intended to inflict emotional distress or knew or should have known that emotional distress was a likely result of his or her conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe. *Petyan v. Ellis,* 200 Conn. 243, 253, 510 A.2d 1337 (1986).

nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." W. Prosser & W. Keeton, Torts (5th Ed.1984), Sec. 12, p. 60. The Restatement [of Torts] puts it as follows: "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " 1 Restatement (Second), Torts[,] Sec. 46, comment (d). *Mellaly*, 42 Conn.Supp. at 19–20, 597 A.2d 846.

While Defendant's alleged conduct[8] may have been rude, inappropriate, or even criminal, it does not rise to the level of extreme and outrageous as required by Connecticut common law. Defendant's interaction with Plaintiff over her duties and performance on the job fall under the realm of supervisory decisions often made "in the rough-and-tumble setting of the American workplace." *Scandura*, 1996 WL 409337, at *2 (district managers' making plaintiff furnish daily sales projections, disallowing her from taking a scheduled vacation for which she had already made airline reservations, and ridiculing her,

"unjustifiably, ... often obscenely," and in a manner which insulted her integrity not extreme and outrageous conduct). Such an employment dispute between an allegedly harsh supervisor and an employee does not form the basis of a claim for intentional infliction of emotional distress. *See Jones v. Tennessee Valley Auth.*, 948 F.2d 258, 266 (6th Cir.1991) (finding defendant's conduct not extreme and outrageous where the evidence showed plaintiff's supervisor intimidated him by assigning him to menial tasks, unfairly reprimanded him, gave him low performance appraisals, monitored his communications with federal agencies, attempted to gain his medical records, and barred him from promotions, bonuses and raises); *Petyan*, 200 Conn. at 253–54, 510 A.2d 1337 (agreeing with trial court that defendant's conduct was not outrageous when he stated plaintiff was released from employment for unsatisfactory performance because of fraud and lying when such reasons were unfounded).[9]

Defendant's alleged requests that Plaintiff purchase drugs for her and stand guard while she ingested drugs, while clearly more offensive than her work-related demands, do not rise to the level of extreme and outrageous behavior. There is no evidence that Defendant's requests were accompanied by any threat of force or physical violence.[10] It

---

8. Defendant's alleged outrageous conduct includes her orders to purchase illegal drugs, orders to stand guard while Defendant ingested illegal drugs, orders to perform personal errands, orders to perform tasks for a private employer, repeated telephone calls to Plaintiff at her home, threats to terminate Plaintiff's employment and replace her with an individual of another race, implementation of discriminatory sick time policies, monitoring of attendance at work, and repeated degrading and humiliating criticism of Plaintiff in the presence of others.

9. *Mellaly*, 42 Conn.Supp. at 17, 597 A.2d 846, cited by Plaintiff, is inapposite to the case at bar. While the "extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity," *Id.* at 20, 597 A.2d 846, Plaintiff does not allege that Defendant proceeded in light of her knowledge of some mental or physical weakness, as was the case in *Mellaly*. As pointed out by the *Mellaly* court,

"The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, *where it would not be so if he did not know.*" *Id.* (emphasis added).

10. Plaintiff's deposition illustrates the nature of these requests:

Q. What made you think she was upset?
A. Because the tone in her voice was louder. She was—she was saying—what was it that she said?—she was saying, "Things happen; things happen." You know, she was upset.
Q. What do you mean "things happen"?
A. That's the way it is.
Q. Did you take that to be a threat when she said "Things happen"?
A. No, I took that to be that that's the way life goes.
Q. Were you in fear that if you didn't do this she would harm you in any way?
A. I was in fear that if I didn't do it she wouldn't treat me better.
Pl.'s Dep. at 158.

appears that Plaintiff could simply have refused to comply, as she allegedly chose to do at some later point.[11] Though Defendant's behavior was, by Plaintiff's description, surprising and sad,[12] it cannot be said to be extreme and outrageous.

Because the conduct alleged to have been inflicted upon Plaintiff by Defendant was not extreme and outrageous, Plaintiff fails to satisfy the second requirement of the test for intentional infliction for emotional distress. As such, her claim must fail and summary judgment in favor of Defendant is granted with regard to Count Three of Plaintiff's Complaint.

## II. Defendant City of Hartford

Plaintiff's claim against the City of Hartford shapes up like this: Each political party represented on the Hartford Court of Common Council is provided with an office in City Hall, largely to carry out constituent services. These offices are furnished by the City, and equipped with telephones and copiers. The Councilors of each represented party are allowed to staff the offices with city employees [13] and are allowed discretion in their operation.

■ There is no express authority for this practice. However, under the City Charter, all powers of the City are vested in the Council. Thus, Plaintiff maintains that the Council's inaction—its practice of leaving Councilors discretion to run their offices—constitutes a "custom" within the meaning of *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and its progeny. More specifically, plaintiff alleges that Councilor Little exercised her discretion pursuant to this "custom" when she violated plaintiff's constitutional rights, and that the City of Hartford should therefore be held accountable for Little's actions.

Municipalities are persons within the meaning of 42 U.S.C. § 1983 and are therefore subject to § 1983 liability. *Id.* at 689–90, 98 S.Ct. at 2035. They may be liable for constitutional violations which occur pursuant to an official municipal policy or custom.[14] *Id.* at 690–92, 98 S.Ct. at 2036. A "policy" is a "statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers." *Id.* A "custom" is a "persistent and widespread discriminatory practice ... so permanent and well settled as to constitute a 'custom or usage' with the force of law." [15] *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036. (citation omitted).

Though it's clear that a policy or custom need not be unconstitutional on its face to be actionable, *City of Canton v. Harris*, 489 U.S. 378, 387–88, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989), "some limitation must be placed on establishing municipal liability through policies that are not themselves unconstitutional, or the test set out in *Monell* will become a dead letter." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985).

"Obviously, if one retreats far enough from a constitutional violation some municipal 'policy' can be identified behind almost any such harm inflicted by a municipal official; for example,[the defendant] would never have killed Tuttle if Oklahoma City did not

---

**11.** Q. How about her asking you to buy drugs for her, did you want that to stop?

 A. Yes. But you know what, I made it clear to her that I wasn't going to do that anymore, that that was it. I went very upset to work. I said, "That is it; you called my house; no more," you know. And then I had a little bit of peace.
 Pl.'s Dep. at 331–32.

**12.** Q. So when she asked you to pay a light bill, you were in shock; when she asked you to buy her cocaine, you were only surprised?

 A. I was surprised and kind of like saddened by her, you know, by the way she was

feeling a little bit. I don't know if I should say saddened.
Pl.'s Dep. at 156.

**13.** Some staffers are "certified service" employees, others are "political appointees."

**14.** Respondeat superior or vicarious liability, however, does not attach under § 1983. *Monell*, 436 U.S. at 692–96, 98 S.Ct. at 2037–38.

**15.** The custom at issue need not have received formal approval through official decisionmaking channels, and it need not have been "authorized by written law." *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036.

have a 'policy' of establishing a police force. *But Monell must be taken to require proof of a city policy different in kind from this latter example before a claim can be sent to a jury on the theory that a particular violation was 'caused' by the municipal 'policy.'* " *Id.* (emphasis added); *see also Canton,* 489 U.S. at 390, n. 9, 109 S.Ct. at 1205, n. 9. For municipal liability to attach, the municipal policy or custom at issue must be the " 'moving force [behind] the constitutional violation.' " *Canton,* 489 U.S. at 389, 109 S.Ct. at 1205 (quoting *Polk County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981)). And when the policy relied upon by a plaintiff "is far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell,*" the Supreme Court has refused to extend liability to the municipality. *Tuttle,* 471 U.S. at 822–24, 105 S.Ct. at 2436.

Finally, though municipal liability may be imposed under § 1983 for a single event or a single decision by a municipal policymaker under appropriate circumstances, *Pembaur v. City of Cincinnati,* 475 U.S. 469, 478–80, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (plurality opinion), "liability should not be imposed when the municipality [is] not itself at fault." *Tuttle,* 471 U.S. at 818, 105 S.Ct. at 2433. And it should not be imposed "simply because the municipality [employed] one 'bad apple.' " *Id.* at 821, 105 S.Ct. at 2435.

Significantly, the practice at issue in this case is not one involving a delegation of final decisionmaking authority. In other words, the City of Hartford has not, on the sly or by its inaction, delegated to *individual* Councilors the authority to make final employment/personnel decisions. *See Pembaur,* 475 U.S. at 484, n. 12, 106 S.Ct. at 1300, n. 12 (even if city grants discretion to an official to hire and fire employees and official then exercises this discretion in unconstitutional manner, his actions do not expose city to liability unless city has delegated to him power to establish final employment policy).

Rather, the practice at issue here simply allows political parties represented on the Council to maintain constituent offices in City Hall, and affords them some discretion in operating those offices. That the City allowed Councilors this discretion does not place it on the hook. *Id.; see also City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988)(plurality opinion)("when an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality.").

Defendant Hartford has established that Councilor Little's discretion was at all times constrained by the City's official employment/personnel policies.[16] In fact, Plaintiff herself testified that she knew her "classified employee" status meant "(Councilors) couldn't just fire her if they chose to." Dep. A. DeLeon, p. 318.

The City's practice of allowing Councilors to maintain constituent offices at City Hall is not itself unconstitutional. It involves a delegation of discretion, not final decision making authority, and it is too "nebulous" and far "too removed" from the alleged constitutional violations to support an extension of municipal liability. *See Tuttle,* 471 U.S. at 822–24, 105 S.Ct. at 2436. Furthermore, Plaintiff's own deposition betrays any notion that this practice rose to the level of a *Monell* "custom" which superseded, stomped-out or otherwise swallowed-up the City's official personnel/employment policies. In short, push and pull as it might, the court cannot stretch

---

**16.** Authority to establish final personnel/employment policy, for certified service employees like plaintiff, resides with the Department of Personnel, its Director, and the Personnel Board. The Director of Personnel is empowered to prepare and recommend to the Personnel Board rules to carry out the provisions of the Charter; the Personnel Board is authorized to adopt or amend the rules recommended by the director and to investigate any or all matters relating to conditions of employment in the City. Official personnel/employment policy is embodied in the City's Personnel Rules and Regulations and its Affirmative Action Plan. While the Court of Common Council retains authority to approve or disapprove rules adopted by the Personnel Board, it does not become involved in individual personnel matters; and *individual* Councilors have no authority to effect final personnel policy. Defendant Hartford's Memorandum in Support of Summary Judgment at 9–11.

this practice over the threshold marked out in *Monell, Tuttle, Pembaur* and *Praprotnik.*

This conclusion, however, does not itself resolve the question of Hartford's potential *Monell* liability, for, under appropriate circumstances, a municipality may be held liable for a single action or decision of a municipal policymaker. *Pembaur,* 475 U.S. at 480–82, 106 S.Ct. at 1299. Noting this subtlety, Plaintiff, of course, alleges that Defendant Little was a policymaker[17] within the meaning of *Monell* and its progeny. *See Pembaur,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Jett v. Dallas Independent School Dist.,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). There is little distinction, however, between a "policymaker" analysis and the analysis set forth above; and the result is the same.

Once again, in *Pembaur,* a plurality of the Court held that "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.... " 475 U.S. at 482, 106 S.Ct. at 1299. And the illustration from *Pembaur* referenced earlier is particularly helpful here:

"[T]he county sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the sheriff is an offi-

cial policymaker, would give rise to municipal liability. Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for liability. *This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner: the decision to act unlawfully would not be a decision of the Board.* However, if the Board *delegated* its power to establish *final employment policy* to the Sheriff, the Sheriff's decision would represent county policy and could give rise to municipal liability."

*Pembaur,* 475 U.S. at 484, n. 12, 106 S.Ct. at 1300, n. 12 (emphasis added). Thus, the court is returned to the barb on which plaintiff finds herself snagged: Defendant Little's lack of final decisionmaking authority over employment/personnel matters. At all relevant times, the plaintiff was a certified service employee, privy to all the protections, rights and remedial procedures that designation carried with it.[18] Defendant Hartford's Memorandum in Support of Summary Judgment at 23–24. Furthermore, it is clear that Plaintiff knew her "classified" position carried certain protections with it.[19]

Plaintiff has filled the record with troubling details about, and allegations against, Defendant Little. However, that Defendant Little was intimidating and dominating, asked plaintiff to run personal errands, asked her to buy drugs, called plaintiff at home when she was out sick and marched to the

---

**17.** Whether an official has final policy making authority is determined by looking to state law, including valid local ordinances and regulations. *Praprotnik,* 485 U.S. at 123–26, 108 S.Ct. at 924–25.

**18.** Even construing the facts in the light most favorable to the plaintiff, it is clear that she did not truly avail herself of these protections. She was not aware that she had been discriminated against until she met with her attorney after her nervous breakdown; and she never told any appropriate city official that she believed she was being discriminated against by Ms. Little. Though she did inform her department head, City and Town Clerk, Mr. Santiglia, about the alleged drug purchases, she did not do so until

more than a year after the last alleged purchase; and even then she refused to put the complaint in writing. And she never availed herself of any of the procedures spelled out in the Affirmative Action Plan. Defendant Hartford's Memorandum in Support of Summary Judgment at 24–25.

**19.** In October of 1991 Defendant Little approached Plaintiff about changing her position from "classified" to "appointed." Plaintiff's deposition testimony reveals that she told Defendant Little that she "didn't want to be appointed, that [she] wanted to remain classified because it gave her security for her son...." Dep. A. DeLeon, p. 318. She also testified that she knew her classified status meant Councilors couldn't just fire her if they chose to.

beat of a dictatorial drum does not make Little a policymaker. *Pembaur*, 475 U.S. at 484, n. 12, 106 S.Ct. at 1300, n. 12; *Praprotnik*, 485 U.S. at 126–28, 108 S.Ct. at 926. Nor do these allegations render meaningless or in any way devalue the official policy protections plaintiff enjoyed as a certified service employee.

If the allegations in the complaint and plaintiff's memoranda are true, there is little doubt that Defendant Little is a "bad apple." She is not, however, a policymaker within the meaning of *Monell* and its progeny; and her conduct, troubling though it is, does not subject the City of Hartford to liability.[20]

It is axiomatic that when all federal claims are eliminated prior to trial, a federal court should decline to exercise jurisdiction over any remaining state law claims. *Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988); *DiLaura v. Power Authority of New York*, 982 F.2d 73, 80 (2d Cir.1992). Plaintiff's remaining claim being a pendent state claim, the court declines to exercise jurisdiction over it.

## CONCLUSION

For the foregoing reasons, Defendant Little's motion for summary judgment (**document no. 53**) should be **granted** in part and **denied** in part, as follows:

Count 1:

* **Denied** as to Plaintiff's First Amendment claim

* **Granted** as to Plaintiff's Fifth Amendment claim

* **Granted** as to Plaintiff's Ninth Amendment claim

* **Granted** as to Plaintiff's substantive due process claim

* **Granted** as to Plaintiff's procedural due process claim

Count 3: **Granted.**

Defendant City of Hartford's motion for summary judgment (**document no. 49**) should be **granted**.

Either party may seek review of this report and recommendation as provided in 28 U.S.C. § 636(b) (stating that written objections to a recommended ruling must be filed within ten days of service of the same); Fed. R.Civ.P. 6(a), 6(e) and 72, and Rule 2 of the Local Rules for United States Magistrate Judges (D.Conn.). Failure to object in a timely manner may preclude further review. *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir.), *cert. denied*, 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir.1989).

It is so ordered this 20th day of March, 1997, at Hartford, Connecticut.

---

20. The court has not turned a blind eye to plaintiff's passing comment that "Ms. Little [was] not provided any supervisory training by the City...." Plaintiff's Response to Defendant Hartford's Memorandum in Support of Summary Judgment at 6. "[T]here are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." *Canton*, 489 U.S. at 387, 109 S.Ct. at 1204. However, this is so only "where [the]

city's failure to train reflects deliberate indifference to the constitutional rights of its inhabitants." *Id.* at 392, 109 S.Ct. at 1206. The City of Hartford has established that it has in place adequate, if not elaborate, policies to protect its employees from the kind of discrimination and harassment alleged in this case. This being so, any failure-to-train claim Plaintiff may have intended falls woefully short of the deliberate indifference standard.