**THADDEUS–X and Earnest Bell, Jr., Plaintiffs–Appellants,**

v.

**BLATTER, et al., Defendants– Appellees.**

No. 95–1837.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 10, 1997.

Decided March 8, 1999.

16. Retek was also a plaintiff in the Oklahoma lawsuit.

Paul D. Reingold (argued and briefed), Ann Arbor, MI, for Plaintiff–Appellant Thaddeus–X.

Thaddeus–X, Baraga, MI, pro se.

Earnest Bell, Jr., Jackson, MI, pro se.

Susan Przekop Shaw, Linda M. Olivieri (argued and briefed), Office of the Attorney General, Corrections Division, Lansing, MI, for Fnu Karazim, Graham, Bildner and Sparks.

Susan Przekop Shaw, Lansing, MI, for Sixto Orozco.

Todd R. Marti (briefed), Office of the Attorney General, Corrections Litigation Section, Columbus, OH, for Amicus Curiae.

Before: MARTIN, Chief Judge; ENGEL, MERRITT, KENNEDY, NELSON, RYAN, BOGGS, NORRIS, SURHEINRICH, SILER, BATCHELDER, DAUGHTREY, MOORE, COLE, CLAY, and GILMAN, Circuit Judges.

PER CURIAM.

The en banc court is divided in this case, but not equally. Eight members of the court favor a decision to affirm in part, vacate in part, and remand in accordance with the opinion written by Judge Moore. There are three separate opinions concurring in part and dissenting in part from Judge Moore's opinion, which the eight other members of the court join in varying combinations.[1]

Judge Kennedy (joined by Judges Boggs, Suhrheinrich, and Batchelder) dissents from Part III.A.4. of Judge Moore's opinion, insofar as it concludes that defendants Graham, Bildner, and Blatter are potentially liable to plaintiffs. Judge Kennedy's opinion accepts defendant Karazim as potentially liable to Thaddeus–X. The rest of the court accepts the potential lia-

---

[1]. Judge Moore's opinion (pp. 383–403) is joined by Chief Judge Martin, and Judges Engel, Nelson, Daughtrey, Cole, Clay, and Gilman.
Judge Suhrheinrich's opinion (pp. 403–406) is joined by Judges Ryan, Norris, Siler, and Batchelder.

Judge Merritt's opinion (pp. 406–408) is joined in part by Judges Kennedy, Boggs, Suhrheinrich, and Batchelder.
Judge Kennedy's opinion (pp. 408–410) is joined by Judge Boggs, and in part by Judges Suhrheinrich and Batchelder.

bility of not only Karazim but also of the three other defendants.

Part III.B.1. of Judge Moore's opinion concludes that X's assistance was necessary for Bell effectively to access the courts. Judge Suhrheinrich (joined by four others) argues for limiting this derivative right to a particular lawsuit on Bell's behalf and against creating a "generalized right to help Bell file inchoate lawsuits." Judge Merritt (joined by Judges Kennedy and Boggs) dissents from the reasoning of this subpart, although he believes that here such help was protected due to a written agreement executed by the prisoners and the prison. Therefore, a majority of the court holds that X's retaliation claim with respect to his assistance in Bell's litigation should proceed.

Seven members of the court, through the opinions of Judges Suhrheinrich and Kennedy, agree with the adoption of the *Bart v. Telford* standard in Part III.B.2. of Judge Moore's opinion (for eight), but disagree with the decision in Judge Moore's opinion to remand on Bell's claim. They would decide the issue as a matter of law in Karazim's favor against Bell, as did the district court. Judge Merritt concurs in the result of Judge Moore's opinion on this issue, thereby providing a majority for remanding this claim for application of the *Bart* standard.

As to the Eighth Amendment claim discussed in Judge Moore's Part III.C., Judge Kennedy (joined by Judges Boggs, Suhrheinrich, and Batchelder) would dismiss it as to defendants Graham, Bildner, and Blatter. The other members of the court are in agreement with the result achieved in Judge Moore's opinion.

Finally, Judge Merritt's opinion (joined by Judges Kennedy, Boggs, Suhrheinrich, and Batchelder) recommends remand to the district court, but with instructions to stay further proceedings pending administrative exhaustion. The rest of the court agrees that a remand to the district court

for further proceedings in that court is appropriate.

Hence, the en banc court VACATES the district court's grant of summary judgment on plaintiff Bell's retaliation claim against defendant Karazim and the grant of summary judgment on plaintiff X's retaliation and Eighth Amendment claims against defendants Karazim, Graham, Bildner, and Blatter; and AFFIRMS the remainder of the district court's judgment. We therefore REMAND the case to the district court for proceedings consistent with this order.

## OPINION

MOORE, Circuit Judge.

Plaintiffs–Appellants Earnest Bell and Thaddeus–X,[1] inmates at the State Prison of Southern Michigan at Jackson, appeal the grant of summary judgment against them on their claims of retaliation by prison officials for their efforts to litigate a civil rights claim on plaintiff Bell's behalf, and X appeals the grant of summary judgment on his Eighth Amendment claim. The essence of the complaints, brought under 42 U.S.C. § 1983, is that prison officials first threatened, and then took, steps to penalize the inmates for their litigative activities. For the reasons discussed below, we vacate in part and remand for proceedings consistent with this opinion.

## I. BACKGROUND

### A. Facts

On April 20, 1994, inmates Bell and X executed a "Legal Assistance Request and Agreement," approved by a prison official pursuant to official prison policy, stating that X would "help [Bell] with any [and] all legal concerns." Joint Appendix ("J.A.") at 15 (Complaint ¶ 9); Dist. Ct. Docket # 4 (copy of agreement). For the next month, X discussed legal matters with Bell and other prisoners on a daily basis and helped

---

1. For ease of discussion, the opinion will simply refer to "plaintiffs," or to Bell and X.

Bell file a lawsuit against prison officials. Although the record on appeal does not disclose the nature of this lawsuit, the complaint states that it is "civil litigation [against] high-ranking MDOC [Michigan Department of Corrections] employees." J.A. at 24 (Complaint ¶ 50). Defendant Karazim—one of the four corrections officials named as defendants in the suit—passed legal materials between the two inmates during this time.

Plaintiffs allege that beginning May 23, 1994, prison officials began to harass them and to attempt to hinder the legal proceedings against the warden and other prison officials. X alleges that defendant Karazim told him to stop giving legal advice to Bell and others on that day, refused to give either plaintiff paper and pens from then on, and stopped passing legal materials between them even after being shown the legal assistance agreement. On June 7, 1994, X complained in writing to a case worker about the lack of paper and pens. On June 8, 1994, Karazim told X that he (Karazim) and his friends were going to "f_ck" X because of the Bell lawsuit, and defendant Blatter told X that he was being moved "on base," to the lowest floor of the administrative segregation area where mentally ill patients are housed, for filing too many lawsuits and grievances. J.A. at 17 (Complaint ¶¶ 17–19).

From June 8, 1994, forward, all of the defendants allegedly refused to pass legal materials between the plaintiffs, or to provide them with paper or pens. Defendant Karazim allegedly told Bell that he had been assigned to harass Bell for suing the warden and deputies, and Karazim began bringing him cold food, adding that this treatment would continue until the lawsuit against the warden was dropped. Defendants Graham and Bildner are alleged to have told X (and other prisoners) repeatedly that he was put on base, and specifically next to an inmate who refused to wash, to punish him for filing lawsuits.

They reportedly said that "no one [could] stop them [from] punishing" him and "now see how well you can con[cen]trate on your legal work with all the sh_t and noi[s]e down here, it's people like you that stressed-out our buddy Sgt. Garrison. A few months down here will stress you out [and] you won't be able to file no lawsuits." J.A. at 19 (Complaint ¶¶ 26–28).

The complaint goes on to allege a list of unpleasant and unhealthy conditions that obtain "on base," including: that the mentally ill prisoners throw human waste and urine at each other and at guards making X afraid to leave his cell, that the foul odor is constant and made X ill and unable to eat, that the other prisoners flood the gallery with water and bang their footlockers so loudly that X cannot sleep, that the adjacent prisoner urinates through the door of his cell and refuses to bathe or flush his toilet, and that this area of the prison is cleaned only on the rare occasions when "deputies or a tour" are expected.

Defendants deny the allegations of Bell and X. They claim that it was not their job to pass legal materials between prisoners, and that if the plaintiffs were ever denied pens and paper, it was because no supplies were available. Defendant Blatter claims that X was moved on base for unspecified "Department rule violations" at the request of Deputy Tamminga and that X had been assigned to the only available cell on base. Karazim claims cold food was delivered only when the menu called for such, and Graham and Bildner deny knowledge of a legal assistance agreement between Bell and X.

## B. Procedural History

The *pro se* complaint filed in the U.S. District Court for the Eastern District of Michigan alleges denial of access to courts, retaliation for accessing courts, and Eighth Amendment violations, among others.[2]

---

**2.** We so read the complaint pursuant to the Supreme Court directive to construe *pro se*

complaints liberally. *Estelle v. Gamble,* 429

The defending prison officials moved to dismiss for failure to state a claim on which relief can be granted and for summary judgment. The matter was assigned to Magistrate Judge Pepe, who issued a Report and Recommendation that advised dismissal of plaintiffs' equal protection and due process (specifically, a state-created liberty interest in giving or receiving legal assistance) claims, but denial of summary judgment on the access to courts, First Amendment retaliation, and Eighth Amendment claims. Upon receipt of the defendants' objections to the magistrate judge's report, District Judge Zatkoff issued his opinion and judgment granting defendants' motion for summary judgment on all counts. Both parties filed timely notices of appeal.

A panel of this court concluded that the retaliation and Eighth Amendment claims should go to trial, but affirmed the district court on its dismissal of the direct denial of access to courts claim (and the two other claims). The panel's decision and opinion were vacated, however, when rehearing en banc was granted. *Thaddeus–X v. Blatter*, No. 95–1837, 1997 WL 169387 (6th Cir. Apr. 11, 1997), *reh'g en banc granted*, 110 F.3d 1247 (6th Cir.1997) (opinion vacated).

## II. STANDARDS FOR GRANTING AND REVIEWING SUMMARY JUDGMENT

We review a grant of summary judgment de novo. *Johnson v. United States Postal Serv.*, 64 F.3d 233, 236 (6th Cir. 1995). The party seeking summary judgment has the initial burden of showing that there is no genuine issue as to any material fact, and we· will reverse a grant of summary judgment if the nonmoving party has presented evidence of specific facts, which, viewed in the most favorable light, indicates that there is a genuine issue for trial. *Id.* Although the nonmoving party "may not rest upon the mere allegations or denials" of his pleading, FED.R.CIV.P. 56(e), a verified complaint or additional affidavit,

as presented in this case, satisfies the burden of the nonmovant to respond. Summary judgment is appropriate "if the pleadings ... and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). The court is not to weigh evidence in making this decision; summary judgment "will not lie ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

We pause to note that the recent Supreme Court decision of *Crawford–El v. Britton*, 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998), clarifies that even when the plaintiff's affirmative case requires a showing of the subjective element of retaliatory motivation on the part of the defendant, as this case does, the above standards for summary judgment apply. In that case, the U.S. Court of Appeals for the D.C. Circuit, sitting en banc, adopted a "requirement of clear and convincing evidence of improper motive [as its] latest effort to address a potentially serious problem: because an official's state of mind is 'easy to allege and hard to disprove,' insubstantial claims that turn on improper intent may be less amenable to summary disposition than other types of claims against government officials." *Crawford–El*, 118 S.Ct. at 1590. The court of appeals had relied on the language and policy concerns underlying the Supreme Court's decision in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), which had eliminated the subjective prong of the qualified immunity defense usually invoked by government defendants. In *Crawford–El*, however, the Supreme Court made clear that when motive is an element of the constitutional wrong alleged in the plaintiff's affirmative

U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

case, the subjective inquiry cannot be avoided. Specifically, the Court determined that the plaintiff cannot be required to meet a heightened burden of proof simply because his cause of action includes a motive element:

> [A]lthough evidence of improper motive is irrelevant on the issue of qualified immunity [under *Harlow v. Fitzgerald*], it may be an essential component of the plaintiff's affirmative case. Our holding in *Harlow*, which related only to the scope of an affirmative defense, provides no support for making any change in the nature of the plaintiff's burden of proving a constitutional violation.

*Crawford–El*, 118 S.Ct. at 1592.

## III. DISCUSSION

Both plaintiffs claim they were retaliated against for engaging in the constitutionally protected activity of accessing the courts. In addition, X alleges conditions of confinement that amount to a violation of the constitutional prohibition against cruel and unusual punishment. U.S. CONST. amend. VIII. We first discuss the appropriate analytical framework for First Amendment retaliation cases in the prison context. We then analyze the plaintiffs' First Amendment and Eighth Amendment claims, and conclude that the district court improperly granted summary judgment on the claims of Bell and X.

### A. The Nature of the Retaliation Claim

■ Section 1983, 42 U.S.C. § 1983, provides a remedy for constitutional violations committed by state actors. In this case, the alleged constitutional violation is in the form of a claim that government officials retaliated against the plaintiffs for exercising their constitutional rights. It is well established that government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right. *See, e.g.,*

*Crawford–El v. Britton*, 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (misdirection of personal belongings may state a claim of retaliation for exercise of First Amendment rights); *Board of County Comm'rs, Wabaunsee County v. Umbehr*, 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (nonrenewal of plaintiff's government contract in retaliation for his exercise of free speech is actionable); *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) ("[I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited."); *Valot v. Southeast Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1225 (6th Cir.) ("[A] claim of retaliation for exercise of the constitutional right of access is cognizable under § 1983."), *cert. denied*, ―― U.S. ――, 118 S.Ct. 164, 139 L.Ed.2d 108 (1997); *Zilich v. Longo*, 34 F.3d 359, 365 (6th Cir.1994) ("The law is well settled in this Circuit that retaliation under color of law for the exercise of First Amendment rights is unconstitutional . . . ."), *cert. denied*, 514 U.S. 1036, 115 S.Ct. 1400, 131 L.Ed.2d 288 (1995). Therefore, for these wrongs, too, § 1983 provides a remedy.

Before turning to the specifics of the retaliation claims of Bell and X, we begin rather broadly with a description of retaliation claims in general, and then of First Amendment retaliation claims in particular. Next, we outline factors unique to the prison setting, and last, we discuss the potential culpability of the named defendants, before we conclude by applying the test we have articulated to the facts of the case at bar in Part III.B.

### 1. Retaliation in General

Retaliation claims arise in any number of contexts. The essence of such a claim is that the plaintiff engaged in conduct protected by the Constitution or by statute, the defendant took an adverse action against the plaintiff, and this adverse action was taken (at least in part) because of

the protected conduct.[3] There are variations on this theme in bodies of statutory law that allow retaliation claims (e.g., ADA, Title VII, NLRA, etc.), but the essential framework remains the same. *See, e.g., Barnett v. Department of Veterans Affairs,* 153 F.3d 338, 343 (6th Cir.1998) (Title VII retaliation claim); *Walborn v. Erie County Care Facility,* 150 F.3d 584, 588–89 (6th Cir.1998) (ADA retaliation claim); *Wrenn v. Gould,* 808 F.2d 493, 500–01 (6th Cir.1987) (Title VII retaliation claim) (citing cases).

"Protected conduct" in the statutory settings is, clearly, that conduct which the statute defines as protected: for example, the National Labor Relations Act protects certain kinds of collective action on the part of employees; Title VII protects individuals from racially (and other) discriminatory employment practices and explicitly disallows retaliation for actions taken in pursuit of those rights. *See* 42 U.S.C. § 2000e–3; *Wrenn,* 808 F.2d at 500. Constitutional retaliation cases are similar in that certain provisions of the Constitution define individual rights with which the government generally cannot interfere— actions taken pursuant to those rights are "protected" by the Constitution.

We pause here to note the difference between constitutional retaliation cases arising under the Due Process Clause of the Fourteenth Amendment and those arising under a more specific provision of the Constitution. Supreme Court precedent suggests that these two types of claims should not be conflated. In *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court rejected various lower courts' reliance on substantive due process standards in evaluating claims of excessive use of governmental force where such claims were covered by explicit provisions in the

Constitution, there the Fourth Amendment. *See id.* at 392, 109 S.Ct. 1865. Reasoning that the "guideposts for responsible decisionmaking in [the substantive due process] area are scarce and openended," *Albright v. Oliver,* 510 U.S. 266, 272, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting *Collins v. Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)), the Court pointed to the Second Circuit's four-factor substantive due process test derived from the "shocks the conscience" concept as an illustration of what should *not* be used when an enumerated constitutional right is available as a source of protection. *See Graham,* 490 U.S. at 392–93, 109 S.Ct. 1865. Instead, "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" *Albright,* 510 U.S. at 273, 114 S.Ct. 807 (quoting *Graham,* 490 U.S. at 395, 109 S.Ct. 1865).

In various instances since *Graham,* this circuit (mainly in unpublished opinions) has subjected prisoners claiming retaliation in violation of an enumerated constitutional right to a heightened requirement that the retaliatory act "shock the conscience." *See McLaurin v. Cole,* 115 F.3d 408, 411 (6th Cir.1997). All of these opinions cite *Cale v. Johnson,* 861 F.2d 943, 950 (6th Cir.1988), for requiring prisoners to make this heightened showing. Yet, reliance on *Cale* for such a proposition is inappropriate and inaccurate. While the Sixth Circuit in *Cale* used an "egregious abuse of governmental power" test and noted that the retaliation was in response to Cale's exercise of his First Amendment rights, it clearly explained that the inmate's claim was based on his general

---

**3.** Some cases cite a four-pronged test, adding a second element that the defendant knew of the plaintiff's protected conduct. This element is captured by the third prong above: the defendant must have known about the protected activity in order for it to have motivated the adverse action. Other cases state the plaintiff's burden even more succinctly: she must show that she was engaged in protected conduct, and that the adverse action taken against her was motivated in substantial part by that conduct.

substantive due process rights and not on the First Amendment. *See id.* at 945. To the extent that our prior decisions have imposed the "shocks the conscience" test when prisoners claim retaliation in violation of an enumerated constitutional right, they are in conflict with the Supreme Court's decisions in *Graham* and its progeny and are no longer the law of this Circuit.[4]

Here, the First Amendment properly covers the retaliation claims of X and Bell, as we explain below, and so we turn to that framework for guidance.

### 2. First Amendment Retaliation

Defendants argue that because the free speech rights of public employees are protected from retaliatory action only if they involve matters of public concern, *see Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the same must be true of prisoners, lest they have greater First Amendment rights than public employees. The difficulty with this argument is the ambiguity of the term "First Amendment rights." First Amendment law is particularly context-driven. Not only does the Amendment protect a rather broad expanse of rights,[5] but even within one category, such as speech, there are multiple levels of protection for different types of speech. Core political speech is most jealously guarded, commercial speech is subject to lesser protection, and obscene speech is left completely unprotected by the First Amendment. Prisoners certainly do not have greater free speech rights than public employees, but the First Amendment interest that is of central importance to prisoners is their right to access the courts, grounded in the Petition Clause, and discussed in Part III.A.3., below.

Because the bulk of First Amendment retaliation claims arise in the public employment setting, it is helpful to draw upon this case law to analyze First Amendment retaliation claims. Although the elements of a First Amendment retaliation claim remain constant, the underlying concepts that they signify will vary with the setting—whether activity is "protected" or an action is "adverse" will depend on context. An example will make the point: whether a plaintiff's speech is "protected" depends on where he is. Standing in a city park (the classic "public forum") at a rally, a citizen is free to say almost anything without interference from the government; any restriction on his speech must be "narrowly tailored to serve a significant government interest." *Clark v. Community for Creative Non–Violence*, 468 U.S. 288,

---

**4.** While several circuits suffer from conflicting case law similar to that outlined above, nearly every circuit has held that First Amendment retaliation claims are cognizable, without referencing substantive due process. *See, e.g., Mitchell v. Farcass*, 112 F.3d 1483, 1489–90 (11th Cir.1997); *Babcock v. White*, 102 F.3d 267, 274–76 (7th Cir.1996); *Crawford–El v. Britton*, 93 F.3d 813, 825–26 (D.C.Cir.1996), *vacated on other grounds*, 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *Penrod v. Zavaras*, 94 F.3d 1399, 1404 (10th Cir.1996); *Graham v. Henderson*, 89 F.3d 75, 79–80 (2d Cir.1996); *Cornell v. Woods*, 69 F.3d 1383, 1387–88 (8th Cir.1995); *Woods v. Smith*, 60 F.3d 1161, 1165 (5th Cir.1995), *cert. denied*, 516 U.S. 1084, 116 S.Ct. 800, 133 L.Ed.2d 747 (1996); *Valandingham v. Bojorquez*, 866 F.2d 1135 (9th Cir. 1989); *Milhouse v. Carlson*, 652 F.2d 371, 373–74 (3d Cir.1981); *McDonald v. Hall*, 610 F.2d 16, 18–19 (1st Cir.1979).

Moreover, several of these cases refer to *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), which holds that if the governmental entity can prove that it would have taken the adverse action in the absence of the plaintiff's protected conduct, it cannot be held liable. *See, e.g., Babcock v. White, Graham v. Henderson, Woods v. Smith, McDonald v. Hall.* This evaluation can be made at the summary judgment stage. We discuss *Mount Healthy* in Part III.B.3., *infra*.

**5.** "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). Standing in his office at a state agency, an employee is free to speak up about matters of public concern; his government employer "enjoy[s] wide latitude" in limiting other speech to enable the office to function properly and efficiently. *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Standing in his cell in a prison, an inmate is quite limited in what he can say; his government jailor can impose speech-limiting regulations that are "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). The fact that certain conduct of the plaintiff must be "protected" in order to state a claim does not change with the setting—what changes is the type of conduct deemed protected in that particular setting.

An overview of the evolution of the "public concern" limitation in the public employment setting will provide a useful example as to why context matters. *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), developed a balancing test for application in First Amendment retaliation cases. After sending a letter to a local paper critical of the Board of Education, the plaintiff teacher was fired. The Supreme Court acknowledged that the school system had interests as an employer that might require greater regulation of speech than a state generally requires of its citizens, but was particularly solicitous of "[t]he public interest in having free and unhindered debate on matters of public importance—the core value of the Free Speech Clause of the First Amendment." *Id.* at 573, 88 S.Ct. 1731. The Court wished to eliminate any lingering notion that public employment could be conditioned on the relinquishment of this type of core First Amendment right, and instead attempted "to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. 1731. With its decision in *Pickering*, the Court was continuing a line of cases that "invalidated statutes and actions [that] sought to suppress the rights of public employees to participate in public affairs." *Connick*, 461 U.S. at 144–45, 103 S.Ct. 1684. Its effect was to broaden, not limit, the rights of public employees.

The cases following *Pickering* continued in this mold: *Perry v. Sindermann*, 408 U.S. 593 (1972), involved the failure to rehire a teacher who had testified before the state legislature to the dislike of the Board of Regents; *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), involved the failure to rehire a teacher who had relayed an internal memo to a local radio station. *Mount Healthy*, however, began to curtail the broadening trend. It held that the teacher could not establish a constitutional violation justifying remedial action if the school could prove that it would have taken the same action in the absence of the protected conduct. And in *Connick*, the Supreme Court found that very little of a questionnaire circulated by an assistant district attorney involved matters of public concern; it was mostly a personal grievance about internal office policy. Thus, the *Pickering* balancing test came out in favor of the government in *Connick*. The employer's concerns that the survey would "disrupt the office, undermine his authority, and destroy close working relationships" was deemed enough to outweigh the attenuated free speech concerns at issue. *Connick*, 461 U.S. at 154, 103 S.Ct. 1684. The Court emphasized that "[t]his [public concern] language, reiterated in all of *Pickering's* progeny, reflects both the historical evolvement of the rights of public employees, and the common sense realization that government offices could not function if every employment decision became a constitutional matter." *Id.* at 143, 103 S.Ct. 1684 (internal footnotes omitted).

With the advent of the "public concern limitation" in these cases, however, plaintiffs began to plead more artfully. If "speech" had to be on a matter of public concern to come within the protections of the First Amendment, perhaps "assembly" or "petitions" did not. Some of the cases cited by defendants, which are drawn almost exclusively from the public employment context, speak in terms of general First Amendment rights; others specifically refer to free speech rights; still others combine claims of free speech with petition or assembly claims. Because the analytic tools for adjudicating First Amendment retaliation claims under the Free Speech Clause have been so extensively developed, courts in this and other circuits have tended to import fully that reasoning when litigants have characterized their claims as arising under another First Amendment clause.[6] This overlay is an understandable response to the attempts of public employees to manipulate First Amendment doctrine in their favor. Most often, the speech or petition at issue is a work-related grievance to the government employer. The story of the public concern limitation is a story about the free speech of public employees. But of course, First Amendment retaliation cases are not limited to that setting.

### 3. The Prison Setting

■ First Amendment rights, like many other rights, are circumscribed in the prison setting. In *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), for example, the Supreme Court held that "a prison regulation [that] impinges on inmates' constitutional rights ... is valid if it is reasonably related to legitimate penological interests." Similarly, *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), holds that "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Thus, review of such regulations offers a considerable degree of deference to the prison authorities, while still retaining ultimate judicial authority to evaluate the constitutional reasonableness of the regulation. *See Turner*, 482 U.S. at 89–91, 107 S.Ct. 2254 (rejecting strict scrutiny and applying a four-factor "reasonableness" test to prison regulations). The role of the judiciary requires weighing the interests of the prison as an institution (in such matters as security and effective operation) with the constitutional rights retained by the inmates.

**6.** *See, e.g., Valot v. Southeast Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1226 (6th Cir.) ("A cause of action for violation of the Petition Clause is subject to the same analysis applied to a claim arising under the Speech Clause."), *cert. denied*, — U.S. —, 118 S.Ct. 164, 139 L.Ed.2d 108 (1997); *Rice v. Ohio Dep't of Transp.*, 887 F.2d 716 (6th Cir. 1989) (characterizing employee's sex discrimination claim as speech for purposes of retaliation analysis and holding that it is not on a matter of public concern), *vacated on other grounds*, 497 U.S. 1001, 110 S.Ct. 3232, 111 L.Ed.2d 744 (1990); *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049,1059 (2d Cir.) (subjecting right-to-petition claim to the same constitutional analysis as the right to free speech), *cert. denied*, 510 U.S. 865, 114 S.Ct. 185, 126 L.Ed.2d 144 (1993); *Belk v. Town of Minocqua*, 858 F.2d 1258 (7th Cir. 1988) (rejecting plaintiff's attempt to characterize threat to appeal Town Board decision as "petition" not "speech," and applying *Con-*

*nick* free speech analysis); *Day v. South Park Indep. Sch. Dist.*, 768 F.2d 696, 701–03 (5th Cir.1985) (rejecting separate Petition Clause analysis when grievance was "on a matter of personal concern"), *cert. denied*, 474 U.S. 1101, 106 S.Ct. 883, 88 L.Ed.2d 918 (1986); *Renfroe v. Kirkpatrick*, 722 F.2d 714 (11th Cir.) (using general First Amendment analysis for nontenured teacher's grievance, including public concern restriction), *cert. denied*, 469 U.S. 823, 105 S.Ct. 98, 83 L.Ed.2d 44 (1984).

*But see San Filippo v. Bongiovanni*, 30 F.3d 424 (3d Cir.1994) (stating that "[t]he petition clause ... was not intended to be a dead letter—or a graceful but redundant appendage of the clauses guaranteeing freedom of speech and press" (*Id.* at 442), indicating the context-specific nature of First Amendment inquiries, and subjecting the petition-clause claim to an analysis distinct from the free speech claim in public employment context), *cert. denied*, 513 U.S. 1082, 115 S.Ct. 735, 130 L.Ed.2d 638 (1995).

■ Just what are the First Amendment rights retained by prisoners? Plaintiffs here allege a First Amendment retaliation claim. Specifically, they each claim to have been punished for exercising their constitutionally protected right to access the courts, partially grounded in the First Amendment's protection of the right to "petition the Government for a redress of grievances." U.S. Const. amend. I. It is well established that prisoners have a constitutional right of access to the courts. *See, e.g., Lewis v. Casey*, 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *Bounds v. Smith*, 430 U.S. 817, 821–24, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) (listing case law supporting the right); *Wolff v. McDonnell*, 418 U.S. 539, 577–80, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (extending *Johnson, infra*, to cover prisoner assistance in civil rights actions); *Johnson v. Avery*, 393 U.S. 483, 488–90, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) (striking down prison prohibition against inmates aiding one another with applications for habeas corpus); *Ex parte Hull*, 312 U.S. 546, 549, 61 S.Ct. 640, 85 L.Ed. 1034 (1941) (striking a prison regulation that essentially screened all prisoner habeas applications); *Berryman v. Rieger*, 150 F.3d 561, 567 (6th Cir.1998) ("It has long been recognized that the lawful resort to the courts is part of the First Amendment right to petition the Government for a redress of grievances."); *John L. v. Adams*, 969 F.2d 228, 231–32 (6th Cir.1992) (listing sources for the right, including the First Amendment).

This is not a generalized "right to litigate" but a carefully-bounded right, as Justice Scalia makes clear in *Lewis v. Casey:*

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis*, 518 U.S. at 355, 116 S.Ct. 2174. Thus, a prisoner's right to access the courts extends to direct appeals, habeas corpus applications, and civil rights claims only. The importance of this right to incarcerated individuals is evident and can hardly be overstated:

> The right to file for legal redress in the courts is as valuable to a prisoner as to any other citizen. Indeed, for the prisoner it is more valuable. Inasmuch as one convicted of a serious crime and imprisoned usually is divested of the franchise, the right to file a court action stands ... as his most "fundamental political right, because preservative of all rights."

*Hudson v. McMillian*, 503 U.S. 1, 15, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (Blackmun, J., concurring in the judgment).

That inmates have a well-established constitutional right to access the courts, based in part on the First Amendment, is clear. Less clear are the contours of free speech rights in the prison setting. No circuit has held that the *Connick* public concern limitation applies to prisoners' speech; conversely, no circuit has held that it does not. The defendants' reliance on *Brookins v. Kolb*, 990 F.2d 308 (7th Cir.1993), for the proposition is misplaced. The prisoner in that case was disciplined for misusing his authority and violating the rules of the Paralegal Base Committee ("PBC") on which he sat. The PBC assisted inmates with their legal research and documents, and Brookins sent a letter on PBC letterhead to prison officials recommending the use of a lie-detector test in another inmate's case and stating that the PBC would pay for the use. He was removed from the committee for violating the rules requiring pre-approval of all committee correspondence and of all fund

requests. He claimed retaliation for the exercise of his First Amendment rights under the Petition and Free Speech clauses. The court characterized his claim as one in violation of his associational rights, which it found to be quite limited in the prison context, and determined that he had not shown the prison's response to be unrelated to legitimate penological objectives. The court found that he did not state a claim under the Petition Clause, as the letter was about another prisoner's case. The court also dispensed with his free speech claim, finding the contents of the letter unprotected. Although the court mentioned that the letter was not on a matter of public concern, *Brookins* is more appropriately characterized as a prison employee in this situation, representing the committee in an inmate grievance proceeding. It is a step removed from his speech as an inmate. In any case, *Brookins* certainly does not implicate *Connick* as a limitation on a prisoner's right to access the courts.

■ Because it· is not at issue in this case, we make no determination about the appropriateness of explicitly applying the public concern limitation to speech by prisoners, whose free speech rights are uncontrovertedly limited by virtue of their incarceration. We hold only that there is no authority for subjecting a prisoner's constitutional right to access the courts, an aspect of the First Amendment right to petition the government for redress of grievances, to the public concern limitation described in *Connick v. Myers*. Nor would such a holding make sense as a policy matter. The right to access the courts is already limited to particularized causes of action—direct appeal, collateral attack, and § 1983 civil rights actions. These actions are always on a matter of personal concern to the prisoner, who can only achieve standing if he alleges a personal injury fairly traceable to a redressable wrong committed against him.[7] A "public concern" limitation would eliminate all prisoner suits protected by the right to access the courts; clearly, a judicial gloss on the First Amendment Free Speech Clause derived from the public employment setting is not an appropriate vehicle for annulling elaborate bodies of statutory law such as the habeas corpus statutes.[8]

The *Pickering* balancing test, described in the preceding section, has been applied in a variety of First Amendment settings. *See, e.g., Umbehr,* 518 U.S. at 678, 116 S.Ct. 2342 ("The tests that we have established in our government employment cases must be judicially administered with sensitivity to governmental needs, but First Amendment rights must not be neglected.... We therefore see no reason to believe that proper application of the *Pickering* balancing test cannot accommodate the differences between employees and independent contractors."). It can as easily be applied in the prison context, accommodating the difference between the government as employer and as jailor, as well as the difference between the free speech rights of a public employee and an inmate's right to access the courts. Certainly the government's interests as an employer are not identical to its interests as a jailor. Safety and order are a high priority in the prison setting, while they are assumed in the typical government office, where the ability, for example, to make hiring or contracting decisions with some degree of flexibility may be more important. A prisoner's First Amendment rights are not more extensive than those of a government employee; in fact, under most clauses of the First Amendment, they are much more strictly limited. However, a prisoner's right to access the courts is clearly established under a long line of

---

**7.** See our discussion of standing in Part III.B, · *infra.*

**8.** Alternatively, we could hold that all § 1983 actions, habeas cases, and direct appeals are per se "matters of public concern" because of the policies embodied in the enabling statutes, but the effect is precisely the same: these actions would not be limited by their content.

Supreme Court precedent, and is for him, in fact, "preservative of all rights." Given the distinctive rights of the two types of plaintiffs, the separate interests of the two types of government entities, and the dissimilar nature of the relationship between the plaintiff and the government in these two settings, any honest attempt to perform the balancing prescribed by the Supreme Court in *Pickering* cannot unhesitatingly import reasoning from the public employment setting into the prison setting. Again, context matters.

### 4. The Named Defendants

 Thus far, we have been speaking about the defendants as a group. An examination of their potential culpability as individuals may be useful at this point. Because Defendant Karazim allegedly told X that "he was going to make sure that plaintiff [was] moved off the floor," J.A. at 16 (Complaint ¶ 15), indicating to X that he played some part in the decision to move X on base, Karazim is properly a defendant to X's retaliation claim, and possibly to his Eighth Amendment claim (see discussion, *infra*, Part III.C.). Defendant Blatter avers that Deputy Tamminga—not a defendant to this action—ordered that X be moved and that Blatter showed X a letter to this effect. If true, defendants Graham, Bildner, and Blatter may have been merely executing their superior's orders when they placed X in the cell on base. Although the district court believed this absolved these defendants of liability, we do not agree. Reliance on a superior's orders does not in itself dissipate all liability. *Raysor v. Port Auth.*, 768 F.2d 34, 38 (2d Cir.1985) (holding police officer liable for false arrest under § 1983 even though arrest was made at superior's order), *cert. denied*, 475 U.S. 1027, 106 S.Ct. 1227, 89 L.Ed.2d 337 (1986); *Villanueva v. George*, 659 F.2d 851, 854 (8th Cir.1981) (en banc) (rejecting prison officers' argument that "since they did not have the authority to alter the [prisoner's security] classification, any consequence of that status cannot be their responsibility"); *Forsyth v. Klein-*

*dienst*, 599 F.2d 1203, 1216–17 (3d Cir. 1979) (rejecting FBI agents' argument that "they were merely following the orders of their superior and should not be put to the test of either disobeying authority or being subject to liability" because "if they knew or should have known that their actions were violating the plaintiffs' constitutional rights, then they will not be allowed to hide behind the cloak of institutional loyalty"), *cert. denied*, 453 U.S. 913, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981). This result accords with longstanding general and specific tort principles. *See* RESTATEMENT (SECOND) OF AGENCY § 343 cmt. d (1958) ("[D]eputy sheriffs who take part in an unlawful arrest ... are subject to liability together with those for whom they act, except where their good faith creates a privilege in them to act.") (citation omitted).

We are mindful that in many situations prison guards must act quickly, with little time to ponder the legality of their actions. Such urgent circumstances are not present in this case and, when they arise in the future, are properly part of a defense of qualified immunity and, where applicable, questions of intent. *See Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). If plaintiffs' allegations are true, each individual defendant may have knowingly participated in actions beyond the pale of acceptable behavior.

Plaintiff X also claims that defendants Bildner, Blatter, and Graham not only refused to give him cleaning supplies so that he could clean his allegedly filthy cell but also refused to allow a prison porter to give him the standard cleaning supplies. This allegation may indicate knowledge on the part of the defendants of the unsanitary conditions facing X, potentially an important part of the Eighth Amendment claim, discussed below.

### B. The Elements of a First Amendment Retaliation Claim

 Before turning to the three elements of the claim, a brief note on stand-

ing is in order. As described above, *Lewis v. Casey* reaffirmed the right of prisoners to access the courts, but it also tightened the standing requirements for inmates claiming a denial of the right. The Court explained that the requirement that an inmate show "actual injury" derives from the constitutional principle of standing. *Lewis*, 518 U.S. at 349, 116 S.Ct. 2174. If a claimant does not have standing, he is barred from bringing suit and the federal court is without jurisdiction to hear the claim. *See Allen v. Wright*, 468 U.S. 737, 750–52, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). In the usual claim alleging denial of access to the courts, an inmate claims that the lack of legal assistance made it impossible for him to take some meritorious legal action. *Lewis* at 349, 116 S.Ct. 2174; *Walker v. Mintzes*, 771 F.2d 920, 932 (6th Cir.1985). In a retaliation claim such as this, however, the harm suffered is the adverse consequences which flow from the inmate's constitutionally protected action. Instead of being *denied* access to the courts, the prisoner is penalized for actually exercising that right. *Cf. Hines v. Gomez*, 108 F.3d 265, 269 (9th Cir.1997) ("[T]he injury asserted is the retaliatory accusation's chilling effect on Hines' First Amendment rights.... We hold that Hines' failure to demonstrate a more substantial injury does not nullify his retaliation claim."), *cert. denied*, —— U.S. ——, 118 S.Ct. 2339, 141 L.Ed.2d 711 (1998); *Dixon v. Brown*, 38 F.3d 379, 379 (8th Cir.1994) ("Because the retaliatory filing of a disciplinary charge strikes at the heart of an inmate's constitutional right to seek redress of grievances, the injury to this right inheres in the retaliatory conduct itself."). As explained above, retaliation for the exercise of constitutional rights is itself a violation of the Constitution.[9] For Article III standing purposes, then, the "plaintiff must allege personal injury fairly traceable to the defendant's allegedly un-

lawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. at 751, 104 S.Ct. 3315. As long as the injury is "distinct and palpable" rather than abstract, conjectural, or hypothetical, it is sufficient to confer standing. *Id.* The facts of this case presented in the complaint and affidavits, many of which are summarized above, indicate real rather than hypothetical injuries. If these injuries were inflicted in retaliation for constitutionally protected conduct as alleged, they are traceable to the unlawful conduct of the defendants and a damages remedy under § 1983 would offer redress.

Having determined that Plaintiffs X and Bell have identified a constitutional cause of action based on the First Amendment and that they have met the threshold requirement of standing, we turn to a more detailed look at the plaintiffs' claims, which the district court found insufficiently supported to withstand a motion for summary judgment by the defendants.

A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct. *See, e.g., Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir.1998); *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 406 (6th Cir.1998); *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir.1997); *Yellow Freight Sys., Inc. v. Reich*, 27 F.3d 1133, 1138 (6th Cir.1994). This formulation describes retaliation claims in general, but it will yield variations in different contexts.

This case deals with retaliation in the context of a prisoner's First Amendment rights and, as will become clear in the

9. "The reason why such retaliation offends the Constitution is that it threatens to inhibit exercise of the protected right. Retaliation is thus akin to an 'unconstitutional condition' demanded for the receipt of a government-provided benefit." *Crawford–El v. Britton*, 118 S.Ct. at 1592 n. 10 (internal citations omitted).

discussion that follows, each step of the analysis is flexible enough to take into account the various contexts in which retaliation claims might be made. For instance, as mentioned earlier, it is generally much harder for a prisoner to show that his conduct is protected because prison regulations are allowed to infringe on prisoners' rights as long as they are rationally related to a legitimate penological concern. *See Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Therefore, if a prisoner violates a legitimate prison regulation, he is not engaged in "protected conduct," and cannot proceed beyond step one. We now proceed with a closer examination of each element.

### 1. *Protected Conduct*

The first step in plaintiffs' retaliation claim is to determine whether they were engaged in protected conduct at all. Absent protected conduct, plaintiffs cannot establish a constitutional violation.

▉▉▉ While Bell was engaged in accessing the courts for his own purposes, X was assisting him in doing so.[10] It is clear in this circuit that an inmate does not have an independent right to help other prisoners with their legal claims. *See Gibbs v. Hopkins,* 10 F.3d 373, 378 (6th Cir.1993). Rather, a "jailhouse lawyer's" right to assist another prisoner is wholly derivative of that prisoner's right of access to the courts; prison officials may prohibit or limit jailhouse lawyering unless doing so interferes with an inmate's ability to present his grievances to a court. *Id.* Thus, only if X's assistance is necessary to vindicate Bell's right of access to the courts can X, too, state a claim of retaliation. We believe that the facts alleged demonstrate such a necessity.

Plaintiff Bell avers and the complaint suggests that Bell has no knowledge of the law and is unable to access the court in any meaningful way absent plaintiff X's assistance. *See* J.A. at 23 (Complaint ¶ 46) ("Plaintiff Bell cannot receive the proper legal advice because the law [librarians are not] trained in any type of law nor do they have any degrees in law."). In light of the liberal reading accorded inmates' *pro se* pleadings, *see Estelle v. Gamble,* 429 U.S. at 106, 97 S.Ct. 285, this adequately alleges that Bell requires X's assistance if he is to have meaningful access to the courts. *Cf. Gibbs,* 10 F.3d at 379–80 (allowing inmate to amend complaint to allege that there were no reasonable alternatives for access to courts other than jailhouse lawyers).

The existence of a prison law library, standing alone, does not necessarily suffice to ensure uneducated or non-English-speaking inmates "a reasonably adequate opportunity to file nonfrivolous legal claims challenging their convictions or conditions of confinement." *Lewis,* 518 U.S. at 356, 116 S.Ct. 2174. This court has noted in another case involving the Michigan prison at Jackson that the Supreme Court has "require[d] that inmates be provided the legal assistance of persons with at least some training in the law," at least "[t]o the extent that inmate writ-writers, or jailhouse lawyers, are not adequately filling the needs of prisoners." *Knop v. Johnson,* 977 F.2d 996, 1006 (6th Cir.1992) (citation omitted), *cert. denied,* 507 U.S. 973, 113 S.Ct. 1415, 122 L.Ed.2d 786 (1993). Because the law librarians at Jackson are such in name only, *see id.* (noting that librarians at Jackson were not competent to perform legal research and inmates hired as law clerks were not allowed to assist other inmates in legal research), and because there is no indication

---

**10.** Plaintiff X also claims that some of the alleged retaliation resulted from his helping inmates other than Bell, that he was moved for filing too many grievances and lawsuits, and that he filed at least one personal grievance. So, although the bulk of the complaint focuses on his work with and for Bell, even

were we to conclude that the library provided Bell with a reasonable alternative, it is likely that X's claims could still withstand summary judgment. (To the extent that X's claims rest on his help of other inmates, he would have to show that they, like Bell, needed his help to effectuate their right to access the courts.)

that the state Prison Legal Services has been able to provide Bell with help, summary judgment for defendants would be appropriate only if access to the books themselves allowed Bell meaningful access to the courts. Bell has alleged that he is wholly ignorant of the law, and at the relevant time, he was in administrative segregation and could only access the library by requesting books by title. In light of our previous statements that some sort of legal assistance is often necessary to provide unschooled inmates with adequate access to the courts, we conclude that Bell's allegations that he needs some sort of legal assistance to effectuate his right of access to the courts are sufficient to allow X's retaliation claim to withstand summary judgment. This does not mean that every uneducated prisoner must be allowed a jailhouse lawyer, of course, but this inmate in this facility has made a showing sufficient to survive summary judgment on the claim that he needed the help of plaintiff X to adequately access the courts.[11]

As outlined above, a consistent line of Supreme Court precedent indicates that prisoners retain a right to access the courts and that prison management cannot interfere with that right. Plaintiffs here utilized an existent prison regulation allowing them to work together on a legal matter in an attempt to vindicate their clearly established right of access to the courts for constitutional claims related to their incarceration. We conclude that they were engaged in protected conduct.[12]

## 2. Adverse Action

The second element of the plaintiffs' case is a showing that an adverse action was taken against them. Both plaintiffs allege various actions taken against them in their complaint and affidavits. It is not necessarily true, however, that every action, no matter how small, is constitutionally cognizable. See Ingraham v. Wright, 430 U.S. 651, 674, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) ("There is, of course, a de minimis level of imposition with which the Constitution is not concerned.").

The term "adverse action" is drawn from employment case law; examples in that context include discharge, demotions, refusal to hire, nonrenewal of contracts, and failure to promote. See, e.g., Umbehr, 518 U.S. 668, 116 S.Ct. 2342 (nonrenewal of contract); Sindermann, 408 U.S. 593, 92 S.Ct. 2694 (same); Pickering, 391 U.S. 563, 88 S.Ct. 1731 (dismissal). In the prison context, an action comparable to transfer to administrative segregation would certainly be adverse. In order to determine whether actions of lesser severity merit being deemed "adverse" for purposes of a retaliation claim, we adopt the standard suggested by Judge Posner in Bart v. Telford, 677 F.2d 622, 625 (7th Cir.1982), that an adverse action is one that would "deter a person of ordinary firmness" from the exercise of the right at stake.

In a recent First Amendment retaliation case in this Circuit, a panel of this court

---

**11.** Lewis v. Casey makes clear that the proper inquiry is whether the individual prisoner's right to access the courts has been impaired, and not whether the law library at his facility is adequate or whether he is entitled to a particular type of legal assistance, such as a jailhouse lawyer. We do not deviate from this precedent requiring an individualized showing of impaired access and certainly do not create "a new constitutional right of representation" for uneducated prisoners, as Judge Merritt fears, see post.

**12.** Contrary to Judge Suhrheinrich's suggestion, this determination does not provide

Thaddeus–X with a "generalized right to help Bell file inchoate lawsuits" nor does it attempt to get around the "actual injury" requirement of Lewis v. Casey. Judge Suhrheinrich correctly notes that the direct "access to courts" claim did not survive summary judgment, but Bell and X allege that they were retaliated against because Bell, with the help of X, filed a lawsuit against the warden and other high-ranking officials. Such retaliation, if true and if sufficient to meet the test we are outlining today, would violate the Constitution.

incorporated the *Bart* standard in its definition of "adverse action." *See Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir.1998). *Bloch* applied the following three-part definition of retaliation: "(1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights." *Id.* Because the adverse action at issue—there, the public release by the local sheriff of shocking and extremely humiliating details about the plaintiff's rape in response to her criticisms in the local paper of his investigation—was deemed sufficient to chill an individual of ordinary firmness from speaking to the press about such matters, the plaintiffs met their initial burden and were allowed to proceed with the retaliation case.

In *Bart* itself, a public employee First Amendment retaliation case, Judge Posner acknowledged that "since there is no justification for harassing people for exercising their constitutional rights [the effect on freedom of speech] need not be great in order to be actionable." *Bart*, 677 F.2d at 625. Continuing, however, he stated that as a tort statute, § 1983 requires injury and "[i]t would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise...." *Id.* A panel of the U.S. Court of Appeals for the D.C. Circuit, on its initial review of *Crawford–El*, approved the *Bart* standard as to the level of injury the prisoner had to show in that case and then remanded to the district court for repleading. *Crawford–El v. Britton*, 951 F.2d 1314, 1322 (D.C.Cir.1991). When the case returned after remand, the en banc

court commented with approval on the district court's application of a "sensible" standard: whether an official's acts "would chill or silence a 'person of ordinary firmness' from future First Amendment activities." *Crawford–El v. Britton*, 93 F.3d 813, 826 (D.C.Cir.1996) (quoting 844 F.Supp. 795, 801 (D.D.C.1994) (quoting *Bart* )). The Supreme Court left this standard undisturbed. We agree with the reasoning in these cases and conclude that it is the appropriate standard by which to determine what type of action is sufficiently adverse to be cognizable in a retaliation claim under § 1983.[13]

This standard is amenable to all retaliation claims. Thus far, only the D.C. Circuit in *Crawford–El* has explicitly used the *Bart* standard in a prisoner retaliation case, although the Fourth Circuit used a similar standard in a prison setting. *ACLU of Maryland v. Wicomico County*, 999 F.2d 780 (4th Cir.1993), involved a § 1983 action brought by a paralegal after her contact visits with inmates were discontinued by the prison. The court concluded that "[w]ithdrawal of a special accommodation of an ACLU paralegal, whether or not it was done in response to filing of a lawsuit, is not sufficiently adverse to her or to the ACLU to constitute retaliation." *Id.* at 785. Because the impact of the prison's action was a de minimis inconvenience to plaintiffs (the ACLU and its paralegal), it did not constitute cognizable First Amendment retaliation: "Appellees have failed to establish the adverse impact necessary to a retaliation claim and thus have failed to assert a constitutional violation." *Id.* at 786.

Other circuits have used the standard in the public employment retaliation context. First, *Bart* itself was a First Amendment public employment retaliation case in the Seventh Circuit. The Fifth Circuit used a similar standard in *Pierce v. Texas Dep't*

---

**13.** This standard differs from that described in our earlier discussion of standing. An injury may be sufficient to confer standing in a

retaliation case and yet be insufficient to be redressable under constitutional tort law.

*of Criminal Justice,* 37 F.3d 1146, 1149–50 (5th Cir.), *cert. denied,* 514 U.S. 1107, 115 S.Ct. 1957, 131 L.Ed.2d 849 (1995). The *Pierce* court mentioned an oft-cited footnote in the Supreme Court opinion of *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), which reads:

> Moreover, the First Amendment, as the court below noted, already protects state employees not only from patronage dismissals but also from "even an act of retaliation as trivial as failing to hold a birthday party for a public employee ... when intended to punish her for exercising her free speech rights."

*Id.* at 76 n. 8, 110 S.Ct. 2729. The quoted language appears to differentiate between direct First Amendment claims and claims of retaliation, and to allow trivial retaliation to be sufficiently adverse to state a claim. The *Pierce* court cited with approval language in the dissent in an earlier Fifth Circuit case, where Judge Garwood correctly explains the origin of the *Rutan* footnote. *Pierce,* 37 F.3d at 1150. As Judge Garwood points out, the Supreme Court was quoting the opinion of the Seventh Circuit Court of Appeals in *Rutan,* which in turn was characterizing (inaccurately, as it turns out) the holding in *Bart v. Telford. Scott v. Flowers,* 910 F.2d 201, 216 (5th Cir.1990) (Garwood, J., dissenting); *Rutan v. Republican Party of Illinois,* 868 F.2d 943, 954 n. 4 (7th Cir.1989). The *Bart* court actually held that "an entire campaign of harassment" was actionable because although it was "trivial in detail," it "may have been substantial in gross." *Bart,* 677 F.2d at 625. The determination of whether the harassment campaign was sufficient to state a retaliation claim under § 1983 was deemed a question of fact, not dismissible as a matter of law. *Id.* Several other courts have used a similar standard in the public employment context. *See, e.g. Agosto–de–Feliciano v. Aponte–Roque,* 889 F.2d 1209, 1217 (1st Cir.1989) (violation of employees' associational rights states a cause of action "only when the government's actions are suffi-

ciently severe to cause reasonably ·hardy individuals to compromise their political beliefs and associations in favor of the prevailing party"); *DeLeon v. Little,* 981 F.Supp. 728, 733–34 (D.Conn.1997) (denying summary judgment and remanding for trial to determine whether harassment for political affiliation was sufficient to deter an employee from holding or expressing beliefs).

■ Like the definition of protected conduct, however, the definition of adverse action is not static across contexts. Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before an action taken against them is considered adverse. The benefits of such a standard are that it is an objective inquiry, capable of being tailored to the different circumstances in which retaliation claims arise, and capable of screening the most trivial of actions from constitutional cognizance. We emphasize that while certain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations, this threshold is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment. Retaliation against a prisoner is actionable if it is capable of deterring a person of ordinary firmness from exercising his or her right to access the courts.

■ The question before us in the case sub judice, then, is whether a person of ordinary firmness would be deterred from exercising a right to access the courts by the actions taken against X and Bell. We need not pause for long in the case of plaintiff X: his allegations, if true, certainly meet the standard. Harassment, physical threats, and transfer to the area of the prison used to house mentally disturbed inmates, especially combined with the conditions allegedly present there, would likely have a strong deterrent effect. With respect to plaintiff Bell, the question is

whether there is a genuine issue of material fact regarding the deterrent effect of the claimed deliberate harassment and cold meals that would continue unless and until he dropped his lawsuit against the warden. J.A. at 18 (Complaint ¶¶ 23, 24). Since we believe that the district court applied an inappropriate test in granting summary judgment on this issue, we remand for a determination by the district court in the first instance under the standard we have articulated today.

### 3. Causal Connection

■ Finally, the third element—a causal connection between the protected conduct and the adverse action—needs to be established by the plaintiffs to complete their affirmative case. Here the subjective motivation of the defendants is at issue. As discussed above, *Crawford–El* disallows any type of "heightened pleading standard" to avoid this consequence. This does not make a plaintiff's burden trivial, however. First, the analysis of motive in retaliation claims utilizes a shifting burden that may mean early dismissal; second, the summary judgment hurdle is not insubstantial, especially when combined with tightly-controlled discovery; and third, the future may mean fewer cases of this sort due to congressional passage of the Prison Litigation Reform Act ("PLRA").

■ The analysis of motive in retaliation claims is well-developed.[14] Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment. In this case, defendants have done little more than deny the allegations put forth by plaintiffs.[15] Such is not sufficient to meet their burden under Federal Rule of Civil Procedure 56 to show affirmatively that there is no genuine issue in dispute. ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file ...' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting FED. R.CIV.P. 56.)).

■ Second, the summary judgment hurdle is not insubstantial. It is worth recalling that "[i]t is obvious, of course, that bare allegations of malice would not suffice to establish a constitutional claim." *Crawford–El*, 118 S.Ct. at 1592. The standard for summary judgment put forth in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), requires the movant to show "that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." Circumstantial evidence, like the timing of events or the disparate treatment of similarly situated individuals, is appropriate. The plaintiffs in this case have done more than simply allege retaliation: in their verified complaint and in an additional affidavit, they have put forward a number of specific, nonconclusory allegations and identified

---

**14.** The *Mount Healthy* motive analysis is well-established in employment case law, and many circuits have applied it explicitly to prison retaliation cases as well. *See* note 4, *supra*. Others do not reference *Mount Healthy* directly, but still use the shifting burden analysis. In this case, both parties agree that it is a proper part of the analysis.

**15.** Although two of the defendants mention an unspecified rule violation, X avers that prisoners are only moved on base for particular types of infractions which he did not commit, and even then they are moved to "the other side of base floor," presumably apart from the mentally ill inmates. J.A. at 71 (X Affidavit ¶ 27).

affirmative evidence that could support a jury verdict at trial. These allegations have essentially been met with summary denials. Of course, the plaintiffs' allegations have not been proven, but the Supreme Court stated that it did "not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

Finally, Congress recently enacted the PLRA. Although the PLRA is not applicable to this case, concerns about future litigants flooding the system with nonmeritorious complaints are somewhat blunted by its passage. The Act precludes the filing of in forma pauperis civil actions by a prisoner who has had three similar petitions dismissed as frivolous, *see Wilson v. Yaklich*, 148 F.3d 596, 599 (6th Cir.1998), and requires the exhaustion of administrative remedies before a prisoner can bring a § 1983 challenge to conditions of his confinement, *see Brown v. Toombs*, 139 F.3d 1102, 1103 (6th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 88, 142 L.Ed.2d 69 (1998), making prisoners alone subject to an administrative exhaustion requirement under § 1983. *See Patsy v. Board of Regents of Fla.*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982).[16]

In sum, although future prisoner litigants may face the more substantial hurdle of the PLRA, in this case, certainly plaintiff X and possibly plaintiff Bell have made a sufficient showing on each element of a First Amendment retaliation claim to survive the defendants' motion for summary judgment.

### C. The Eighth Amendment Claim

■ Plaintiff X also alleges that the conditions that obtained on base and in his cell in particular, taken together, amount to a violation of his right to be free from cruel and unusual punishment (recounted briefly in the factual statement, Part I.A.). The record also contains a grievance form, signed by X and dated June 25, 1994, which states that a prisoner in a nearby cell has been "using the toilet on his floor [and] urinating out his door," and that the smell was making X ill. J.A. at 118. None of the affidavits provided by the defendants directly dispute any of the allegations put forth by X on these conditions.[17] There is a rather limited affidavit, in the docket but not in the record on appeal, by MDOC Litigation coordinator Cynthia Acker stating that she was unable to find any record of an inmate spreading feces on his wall on June 8, 1994. Dist. Ct. Docket # 65 ¶¶ 5–9. This document has a "Sanitation Inspection" report attached that indicates satisfactory conditions on base and is dated one day after X was moved to his new cell. J.A. at 120. Standing alone, this report does not vitiate plaintiff's factual claims for summary judgment purposes.

■ The Supreme Court has described two general categories of Eighth Amendment claims in the prison setting: those involving "conditions of confinement," *e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), *Helling*

---

**16.** Contrary to Judge Merritt's suggestion, these prisoners are not subject to an exhaustion requirement under 42 U.S.C. § 1997e(a) because this case was not only filed but pending in the court of appeals well before passage of the PLRA, and the provision does not apply retroactively. *See Wright v. Morris*, 111 F.3d 414 (6th Cir.1997). The earlier provision, which governs this case, allowed a federal court to stay an action pending administrative review if such a measure would be "appropriate and in the interests of justice." Early closure on this case is now impossible, and it

is hard to see how the interests of justice are served by such a disposition.

**17.** There is one factual dispute on this issue. X claims that two members of the nursing staff requested that he be moved because he is not mentally ill, J.A. at 25, 72 (Complaint ¶ 54, X Affidavit ¶ 36), and defendant Blatter claims he could locate in X's medical file no written request "by nursing staff that Plaintiff be moved for medical reasons." J.A. at 55 (Blatter Affidavit ¶ 11).

v. *McKinney,* 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993), *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), and those involving "excessive use of government force," *e.g., Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). All Eighth Amendment claims have an objective component, and when "the pain inflicted is not formally meted out as punishment by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer" in order to make out the subjective component of an Eighth Amendment violation. *Wilson v. Seiter,* 501 U.S. at 300, 111 S.Ct. 2321. However, the subjective prong differs in the two sets of cases; that is, the state of mind necessary in order to find a prison official in violation of the Eighth Amendment depends on the nature of the case— whether it describes the conditions of confinement facing the inmate, or alternatively involves the excessive use of force against him. Plaintiff X challenges the conditions of his confinement on base, but first, we briefly examine the Supreme Court decisions on the state-of-mind requirements for Eighth Amendment violations.

■ One of the earliest cases to discuss state of mind for Eighth Amendment violations was *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), in which a prisoner charged that he was subject to cruel and unusual punishment because he was denied adequate medical care. The Court determined that the objective component of the Amendment encompasses not only "physically barbarous punishments," *id.* at 102, 97 S.Ct. 285, but also the infliction of "unnecessary suffering [that] is inconsistent with contemporary standards of decency." *Id.* at 103, 97 S.Ct. 285. *Estelle* acknowledged that "punish-

ment" could go beyond that which was specifically part of the sentence and could include the conditions facing the inmate once imprisoned. The Court concluded on the facts before it that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'" required to state a cause of action, but that "inadvertent failure to provide adequate medical care" does not reach the threshold. *Id.* at 104–05, 97 S.Ct. 285. In order to state an Eighth Amendment claim in a medical mistreatment case, then, a prisoner must show unnecessary suffering brought about by the deliberate indifference of prison medical staff to his needs.

■ Utilizing this requirement of "unnecessary and wanton infliction of pain" in *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986), the Court explained that it should be "applied with due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged." *Id.* at 320, 106 S.Ct. 1078. *Whitley* involved a prison riot during which an armed guard shot the plaintiff in the leg in an attempt to free a guard being held hostage by the rioting prisoners. Because a riot situation requires hasty decisions by the prison officials, made under pressure and in an attempt to balance competing concerns for the safety of prison staff and other inmates, the "deliberate indifference" standard of *Estelle* is inappropriate. When the claim is excessive use of force in an emergency situation, the question for a court is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* at 320–21, 106 S.Ct. 1078 (internal quotation omitted). In other words, the state-of-mind showing that a plaintiff must allege and meet in cases of excessive force is much higher than in conditions-of-confinement cases.

The Court explained the difference between these two standards in *Wilson v. Seiter.* In both situations, the offending

conduct must be "wanton," but the constraints facing the official at the time he engages in the conduct are crucial to determining what constitutes wantonness. In an emergency situation like *Whitley*, where split-second decisions are necessary, "malicious and sadistic" conduct is wanton; in a prison conditions case like *Wilson*, where reflection is possible, wantonness entails "deliberate indifference." *Wilson*, 501 U.S. at 302–03, 111 S.Ct. 2321. Because the various conditions to which Wilson claimed he was subjected were not perpetrated against him "under materially different constraints" than those taken with respect to medical care, the *Estelle* "deliberate indifference" standard was applied. *Id.* at 303, 111 S.Ct. 2321. *Hudson v. McMillian*, an excessive force case, held that although the injury sustained by the inmate must be more than de minimis, it need not be particularly serious in order to sustain an Eighth Amendment claim. The case indicated that because the objective prong draws context from society's evolving standards, "contemporary standards of decency always are violated" "[w]hen prison officials maliciously and sadistically use force to cause harm." *Hudson*, 503 U.S. at 9, 112 S.Ct. 995.

Most recently, the Supreme Court has dealt with two other conditions of confinement cases. *Helling* involved a prisoner's exposure to large amounts of environmental tobacco smoke due to a cell-mate who smoked five packs of cigarettes a day. The Court held that he stated a cognizable cause of action under the Eighth Amendment. The subjective element would require a showing that prison officials were deliberately indifferent to a substantial risk of harm to his health—the fact that the potential medical injury lay in the future did not change the analysis. The objective element would require a showing that society considers the risk he faces "to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly" to it. *Helling v. McKinney*, 509 U.S. at 36, 113 S.Ct. 2475 (emphasis in original). Finally, *Farmer* more specifical-

ly defined the term "deliberate indifference" in the Eighth Amendment context. It is a subjective type of deliberate indifference, akin to criminal recklessness: Was *this individual prison official* aware of the risk to the inmate's health and deliberately indifferent to it? *Farmer*, 511 U.S. at 837, 844, 114 S.Ct. 1970.

■ X's Eighth Amendment claim concerns the conditions of his confinement, and the magistrate judge so analyzed them. Finding that the sickening conditions in X's cell and on base were known to defendants and that they did nothing to rectify them, despite the fact that "[p]rolonged exposure to [them] could be found to fall below minimum civilized standards" by posing a substantial risk to X's health, the magistrate judge recommended that the issue go to trial. J.A. at 94 (Magistrate's Report and Recommendation at 22). In so ruling, he indicated his belief that a jury could find the conditions sufficiently serious under the objective prong, and the defendants' states of mind sufficiently culpable under the "deliberate indifference" subjective prong, to make out an Eighth Amendment violation.

It is true that X was not alone in his exposure to these conditions, however. The mentally ill inmates, themselves somewhat responsible for the squalid conditions, were persistently exposed to a similar health risk. The Supreme Court in *Farmer* clarifies the distinction between X and the mentally ill inmates for Eighth Amendment purposes:

> [P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. A prison official's duty under the Eighth Amendment is to ensure "reasonable safety," a standard that incorporates due regard for prison officials' "unenviable task of keeping dangerous men in safe custody under humane conditions."

*Farmer,* 511 U.S. at 844–45, 114 S.Ct. 1970 (internal citations omitted). Due to the uncontrollable behavior of the mentally ill inmates, it may be a reasonable response for prison officials to keep them all in one place, apart from the rest of the prison population. At any rate, it is a separate Eighth Amendment inquiry, not at issue here. In X's case, he alleges that he was forcefully put on base as a result of his litigative activities, thereby *creating* a health risk for X. While it is arguably reasonable to subject the mentally ill inmates to unsanitary conditions that they themselves create, it is not reasonable in the case of X. There is even an element of maliciousness in the claimed attitude of the guards toward X, in their purposeful hope that "the sh_t and noi[s]e down here" would render X ineffective, but of course X need only show deliberate indifference. We therefore hold that he has pleaded sufficiently to survive summary judgment on his Eighth Amendment claim.

## IV. CONCLUSION

 For the reasons discussed above, we **VACATE** the district court's grant of summary judgment on plaintiff Bell's retaliation claim against defendant Karazim, and we **VACATE** the grant of summary judgment as to plaintiff X's retaliation and Eighth Amendment claims against defendants Karazim, Graham, Bildner, and Blatter. We **AFFIRM** the remainder of the district court's judgment,[18] and **REMAND** for proceedings consistent with this opinion.

SUHRHEINRICH, Circuit Judge, concurring in part and dissenting in part.

## I.

This case, which countenances a prisoner's complaint about cold food, perfectly

illustrates the illogic of prisoner retaliation claims. As Chief Justice Rehnquist observed in his dissent in *Crawford–El:*

> If the purpose of § 1983 is to "deter some state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails," it is hard to see how that purpose is substantially advanced if petitioner's suit is allowed to proceed. Petitioner has already fully exercised his "federally guaranteed right." Providing compensation to him, even if his claim is meritorious, will foster increased constitutional freedoms only for the hypothetical subsequent individual, who, given the imposition of liability in this case, will not be deterred from exercising his First Amendment rights out of fear that respondent would retaliate. . . .

*Crawford–El v. Britton,* 523 U.S. 574, 118 S.Ct. 1584, 1602, 140 L.Ed.2d 759 (1998) (Rehnquist, J., dissenting) (quoting *Wyatt v. Cole,* 504 U.S. 158, 161, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992)). Furthermore, the majority opinion in this case needlessly expands *Crawford–El.* I therefore dissent as to sections III.B.1. and III.B.2.

## II.

In **III.B.2.** of its opinion, the majority remands to the district court the question of whether the prospect of cold food would deter a prisoner of ordinary firmness from exercising his right to access the courts. Under the majority opinion's newly-formulated test, there can be only one answer: as a matter of law, the threat of being served cold food cannot possibly deter the average convicted criminal from filing a lawsuit.

---

**18.** We do not address defendants' belated argument that they are entitled to qualified immunity. It was not presented to this court in the initial briefs on appeal and is therefore waived. FED. R.APP. P. 28(a)(3) and (b) (stating that the appellee's brief must include an argument containing the contentions of the

parties and the reasons for them); *see also Bickel v. Korean Air Lines Co.,* 96 F.3d 151, 153 (6th Cir.1996) (defendant waived issue by failing to raise it in its opening briefs to the court of appeals), *cert. denied,* 519 U.S. 1093, 117 S.Ct. 770, 136 L.Ed.2d 716 (1997).

Such "harassment" cannot reasonably be said to deter the average citizen of ordinary firmness. Two-thirds of most American meals are typically eaten cold. Cold cereal or a bagel for breakfast and a sandwich for lunch are standard American fare. Our military defends the nation in times of war on a diet of cold food rations. And cold food is not always a matter of expediency. Steak tartare and shrimp cocktail, served in the finest restaurants, are served cold. One man's vichyssiose is another man's cold potato soup.

In short, it is absurd to think that being served cold food, even on a long-term basis, might "chill" anyone—criminal or non-criminal—from filing a lawsuit. If anything, such a holding "would trivialize the First Amendment." *See Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982). Judge Posner's observations bear repeating:

> Yet even in the field of constitutional torts *de minimis non curat lex.* Section 1983 is a tort statute. A tort to be actionable requires injury. It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise....

*Id; see also Ingraham v. Wright,* 430 U.S. 651, 674, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) ("There is, of course, a *de minimis* level of imposition with which the Constitution is not concerned.").

Furthermore, cold food apparently is an ordinary incident in prison life. *See, e.g., Dean v. Campbell,* No. 97–5955, 1998 WL 466137, at *2 (6th Cir. July 30, 1998) (per curiam) (holding that allegation of cold meals for a short period of time "fail[ed] to allege facts showing that [prisoner] was subjected to the type of extreme deprivations which are necessary for an Eighth Amendment conditions of confinement claim"); *Johnson v. Horn,* 150 F.3d 276, 282 (3d Cir.1998) (holding that serving cold instead of hot kosher food to inmate did not violate prisoner's First Amendment rights); *Brown–El v. Delo,* 969 F.2d 644, 648 (8th Cir.1992) (holding that prisoner's constitutional rights were not violated when he was served cold food); *Madyun v. Thompson,* 657 F.2d 868, 874–75 (7th Cir.1981) (holding that allegation that food served to segregated prisoners was cold and not on menu served to general prison population was insufficient to state an Eighth Amendment claim); *McCrary v. Delo,* No. 93–3800, 1994 WL 706548 (8th Cir. Dec. 21, 1994) (per curiam) (holding that serving cold food to prisoner for three days was not cruel and unusual punishment); *Prophete v. Gilless,* 869 F.Supp. 537, 538 (W.D.Tenn. Nov.15, 1994) (holding that cold food does not pose danger to inmate health and thus does not constitute deprivation of necessity of life); *Smith v. Copeland,* 892 F.Supp. 1218, 1229 (E.D.Mo.1995) (holding that diet of only cold food, in and of itself, does not offend the Constitution), *aff'd,* 87 F.3d 265 (8th Cir.1996); *Dillard v. DeTella,* No. 95–5575, 1998 WL 111704 (N.D.Ill. March 12, 1998) (dismissing prisoner's claim in its entirety, including claim that he was served cold food and no utensils); *Cruz v. Jackson,* No. 94 Civ. 2600, 1997 WL 45348 (S.D.N.Y. Feb. 5, 1997) (holding that prisoner's allegation that he was served cold food for four months was insufficient to give rise to claim under Eighth Amendment); *Ivy v. Washington,* No. 96 C 3012, 1996 WL 685455 (N.D.Ill. Nov. 25, 1996) (holding that claim of being served cold food does not state a violation of the Eighth Amendment); *Williams v. Washington,* No. 95 C 5126, 1996 WL 137670 (N.D.Ill. March 25, 1996) (holding that receiving meals delivered cold did not exceed deprivations one could expect from prison life); *Vinegar v. Fairman,* No. 95 C 844, 1995 WL 769758 (N.D.Ill. Dec. 29, 1995) (rejecting claim that being served cold food violated the Eighth Amendment; noting that the Constitution requires only that inmates receive adequate nutrition); *Fisher v. Department of Correction,* No. 92 Civ. 6037(LAP), 1995 WL 608379 (S.D.N.Y. Oct.16, 1995) (hold-

ing that prisoner's claim that his food was sometimes cold did not rise to the level of a constitutional violation); *Flournoy v. Sheahan*, No. 93 C 1983, 1994 WL 605584 (N.D.Ill. Nov. 2, 1994) (holding that being served cold food is not a constitutional violation); *Watson v. Sheahan*, No. 93 C 1871, 1994 WL 95782 (N.D.Ill. March 18, 1994) (ruling that prisoner "has failed to explain how the alleged conditions of eating cold food without certain utensils while standing up or sitting on the floor present an immediate danger to his health"); *cf. Cunningham v. Jones*, 567 F.2d 653, 659–660 (6th Cir.1977) (observing that complaints about the preparation or quality of prison food "would generally be far removed from Eighth Amendment concerns").

As the majority stresses, "context matters." Plaintiffs here are not average citizens, but convicted criminals, and therefore "cannot expect the amenities, conveniences and services of a good hotel." *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir.1988). As the majority holds, this is an "objective inquiry" which we can, and should, be decided as a matter of law without further resort to the district court. I would therefore affirm the district court's dismissal of Bell's retaliation claim against defendant Karazim. For these reasons I dissent from **III.B.2.**

## III.

I also disagree with the majority's discussion in **III.B.1.** dealing with Thaddeus–X's protected conduct. As the majority opinion makes clear, a retaliation claim is premised upon the exercise of a protected right. Here, the protected right is the right to access the courts. As the majority recognizes, Thaddeus–X's protected right, and therefore his retaliation claim, are derivative of Bell's: "only if X's assistance is necessary to vindicate Bell's right of access to the courts can X too, state a claim of retaliation." Maj. Op., at ¶ 44.

In establishing the source of Thaddeus–X's derivative right, the majority continues that "Plaintiff Bell avers and the complaint suggests that Bell has no knowledge of the law and is unable to access the court in any meaningful way absent plaintiff X's assistance." *Id.* at ¶ 45. This allegation fails to satisfy the actual injury requirement of *Lewis v. Casey*, 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) because it does not allege that Bell was prevented from pursuing or defending any particular claim, let alone a direct appeal, habeas, or § 1983 action. *See Lewis*, 518 U.S. at 355, 116 S.Ct. 2174 (Scalia, J., dissenting). As the majority notes, the right to access the courts is not a generalized "right to litigate," but rather a carefully circumscribed right. As the Supreme Court held in *Lewis:*

> Because *Bounds* [*Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)] did not create an abstract, free-standing right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is sub-par in some theoretical sense.... Insofar as the right vindicated by *Bounds* is concerned, "meaningful access to the courts is the touchstone, ... and the inmate therefore must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim. He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known. Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable to file a complaint.

*Lewis*, 518 U.S. at 351, 116 S.Ct. 2174.

The majority forgets that it affirms the district court's dismissal of Thaddeus–X's

and Bell's access to courts claim.[1] Thus, other than helping Bell file a lawsuit, Thaddeus–X has not shown that he engaged in protected conduct so as to maintain a retaliation claim.[2] Thaddeus–X's retaliation claim should therefore be limited to his assistance in helping Bell file a lawsuit. Ironically, the majority has essentially accorded greater First Amendment protections to Thaddeus–X than to Bell himself. Thus, to the extent the majority recognizes a discrimination claim that is premised upon Thaddeus–X's generalized right to help Bell file inchoate lawsuits, it is contrary to law.

### IV.

As noted above, I simply fail to see the logic of *Crawford–El.* Like Justice Rehnquist, I simply cannot understand why we are affording heightened protection to prisoners on a "subspecies of First Amendment claims," *id.* at 1601; when the alleged acts, standing alone, "would seem to be about as far from a violation of the First Amendment as can be conceived," *id.,* and the prisoner *has in fact not been prevented* from exercising his First Amendment rights. We do not hesitate in holding that prisoners are entitled to diminished constitutional protections on direct First and Eighth Amendment claims. Yet we allow a prisoner, by mere recitation of an illicit motive, to "transform[ ] a routine act in the course of prison administration into a constitutional tort." *Id.* In short, I do not think *Crawford–El* is faithful to § 1983. *See Crawford–El,* 118 S.Ct. at 1604 (Scalia, J., dissenting) (remarking that in his view, "no 'intent-based' constitutional tort would have been actionable under the § 1983 that Congress enacted").

I therefore **dissent** from parts **III.B.1.** and **III.B.2.**. As to the remainder of the opinion, I **concur** in the result only.

MERRITT, Circuit Judge, concurring in part and dissenting in part.

This prisoner case is controlled by the Supreme Court's recent opinion in *Crawford–El v. Britton,* 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998), which had not been decided when the District Court ruled in the instant case three years ago. In *Crawford–El,* according to the Court's statement of the facts, "a litigious and outspoken prisoner" had "filed several lawsuits and . . . assisted other prisoners with their cases." *Id.* at 1587. Like Bell and Thaddeus–X in the instant case, he sued a prison official under § 1983 alleging specific acts of retaliation designed to "punish him for exercising his First Amendment rights [of access to the courts] and to deter similar conduct in the future." *Id.* The D.C. Circuit had held that in "an unconstitutional-motive case, the plaintiff must establish that motive by clear and convincing evidence." *Id.* at 1589. The Supreme Court reversed, holding that it is unnecessary in such a retaliation case claiming deprivation of access to the courts for the prisoner to establish his case by a heightened "clear and convincing" standard of proof. Both the majority opinion and the dissenting opinion in the Supreme Court clearly agree on the particular point our Court decides here: that such a retaliation suit presents a valid constitutional claim of denial of the right of access to the courts. The only difference between the majority and the dissent goes to the question of qualified immunity. Chief Justice Rehnquist's dissent, quoted below, proposes a

---

**1.** In the original panel decision, the court reasoned that dismissal was proper because Thaddeus–X and Bell had failed to show actual prejudice. Although Bell had alleged that he was unable to respond to a magistrate judge's report and recommendation denying him a temporary restraining order, the panel found no actual injury alleged because "plaintiffs have provided no information about this

case, such as whether the court eventually granted the T.R.O., or whether the request for one was frivolous. . . . "

**2.** This same criticism applies to the statement in footnote 10 regarding Thaddeus–X's claims that "some of the alleged retaliation resulted from his helping inmates other than Bell. . . . "

broader test of immunity for prison officials than the majority:

> Under this test, when a plaintiff alleges that an official's action was taken with an unconstitutional or otherwise unlawful motive, the defendant will be entitled to immunity and immediate dismissal of the suit if he can offer a lawful reason for his action and the plaintiff cannot establish, through objective evidence, that the offered reason is actually a pretext.

*Id.* at 1600.

In the instant case the defendant prison officials as yet have offered no explanation or reasons for their actions against Bell and Thaddeus–X, either pretextual or otherwise. The *Crawford–El* case establishes a cause of action for deprivation of the right of access under the First Amendment in such prisoner retaliation situations, and the defendant prison officials have not at this point asserted facts giving rise to a valid claim of qualified immunity. I therefore see no need for the long discussion in Section III of our Court's opinion, a discussion that seems to me both unnecessary and likely to come back to haunt us in the future.

For example in subsection III.B.1, "Protected Conduct," the Court states that "if X's [the jailhouse lawyer's] assistance is necessary to vindicate Bell's right of access to the courts," "X too [can] state a claim of retaliation." The Court then finds the assistance "necessary" because "Bell has no knowledge of the law" and he "cannot receive the proper legal advice because the law librarians are not trained in any type of law nor do they have a degree in law." I do not believe that an "uneducated" prisoner so situated has a constitutional right to a jailhouse lawyer and that every such jailhouse lawyer has a constitutional right to represent such fellow prisoners. The Court gives no source for such an unprecedented set of prisoner rights based on ignorance. This statement in the Court's opinion is likely to produce an unending stream of cases as "uneducated" prisoners and jailhouse lawyers assert their new constitutional right of representation. Thousands of new prisoner petitions may flood the courts as "uneducated" prisoners and jailhouse lawyers seek injunctions and damages to enforce what the court appears to say is a new constitutional right of prison representation.

Instead of creating such a broad substantive right, we should simply apply the reasoning of *San Filippo v. Bongiovanni*, 30 F.3d 424 (3d Cir.1994). In the instant case, the prison officials, pursuant to their own regulations and official prison policy, approved a form allowing Thaddeus–X to represent Bell. Once the prison officials through their own actions had set up a procedural system for Thaddeus–X to represent Bell and had approved the representation in writing, they could not then withdraw this right in retaliation for a lawsuit that criticized prison officials. As the *San Filippo* case cogently explains, such retaliation against an actor for using the legal processes previously established administratively violates the right of access provision of the First Amendment.

In view of the clarification of the law that the *Crawford–El* case represents, I would remand this case to the District Court with instructions to stay further proceedings while the prisoners exhaust their prison administrative remedies, as required by 42 U.S.C. § 1997e. The provision requires the exhaustion of all "available" state "administrative remedies" by a prisoner before a federal court should entertain his civil rights action. Exhaustion of such remedies will produce an administrative record of what actually occurred and provide Michigan correction officials with an opportunity to address and redress any wrongful, retaliatory conduct found to have occurred. The *Crawford–El* case clarified the law in prison retaliation cases, and it would be wise for our court to treat this case like we treat other administrative cases when the law is changed or clarified during the pendency of the proceedings— remand the case to the administrative

agency for reconsideration in light of the change.

KENNEDY, Circuit Judge, concurring in part and dissenting in part.

I concur with Judge Suhrheinrich that Bell's complaint that Karazim served him cold food and refused to reheat his food does not rise to the level of conduct which would deter an average convicted prisoner from filing a lawsuit. The only other claim Bell makes against Karazim (he makes no claims against the other defendants) is that Karazim, who had no responsibility for transferring legal material between Bell and Thaddeus X but had nonetheless done so, refused to do so after Thaddeus X was moved to base. The average prisoner would not be deterred from filing a lawsuit because a correctional officer ceased to do more than was required by his job. If correctional officers are held liable under these circumstances, correctional officers will be highly unlikely to do anything more than the strict requirements of their specific jobs.

I concur in the majority's adoption of the Seventh Circuit's standard stated in *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir.1982) that an adverse action is one that would "deter a person of ordinary firmness" from the exercise of the right at stake. I would, however, add to it the limiting strictures the Supreme Court adopted in *Sandin v. Conner*, 515 U.S. 472, 482–83, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). While it is unlikely that actions that are within the *Sandin* limits would deter a prisoner from filing a lawsuit, I believe if we are adopting a policy it should have this limitation.

I concur that the summary judgment in favor of Karazim should be reversed on Thaddeus X's claim. Thaddeus X's affidavit states that Karazim told him he would have him transferred to base in retaliation for assisting Bell in his lawsuit. While Karazim's affidavit states that he was merely following the written orders of Sergeant Tamminga, not defendant, there is

an issue of fact as to who was responsible for the move.

With respect to the remaining defendants, I would affirm the summary judgment. The only conduct on their part that would deter a prisoner from filing a lawsuit is transferring Thaddeus X to base and his consequent incarceration there. There is no allegation that Graham, Bildner, or Blatter did more than carry out Tamminga's order in moving Thaddeus X to base. Nor do the circumstances permit a factfinder to conclude that they would have acted any differently had Thaddeus X been a favorite prisoner whom they wished to help in any way possible. There is simply no basis for a factfinder to find these defendants removed Thaddeus X to base in retaliation for anything.

I cannot agree that defendants Graham, Bildner, and Blatter can be held liable for carrying out their superior's order to move Plaintiff X to base. The majority holds that they may not rely on a superior's order. In *Raysor v. Port Authority of New York & New Jersey*, 768 F.2d 34 (2d Cir.1985), cited by the majority, the Second Circuit held that a police officer who arrested the plaintiff at the order of a sergeant had potential liability under section 1983, "both for making the arrest without a good faith belief 'that the order imparted to him by [the sergeant] was a lawful order,' and for knowingly making false or incomplete statements on the accusatory instrument." *Id.* at 38. Plaintiff X makes no such assertion here. He did not sue Sergeant Tamminga, who issued the order to move him to base. There is no allegation that the order was illegal, let alone that any of these three defendants knew or should have known it was illegal. While conditions alleged on base may have been deplorable, I do not believe they were so deplorable that a correctional employee would know that they violated the Eighth Amendment. Numerous other prisoners were housed there. These officers were not responsible for the conditions on base

nor is it alleged they had authority to move Plaintiff X elsewhere.

While the question of whether there is probable cause to arrest, the issue in *Raysor*, is often a difficult one, it is one that police officers are charged with applying daily. Whether conditions in a prison violate the Eighth Amendment is not one which prison guards are expected to determine before carrying out orders.

While *Forsyth v. Kleindienst*, 599 F.2d 1203, 1216–17 (3d Cir.1979), also cited by the majority, does indeed hold that following orders does not entitle FBI agents to absolute immunity, that does not seem to be the issue here. The officers here are not claiming absolute immunity. As I understand their position and that of the district court, it is that there was no obligation when following orders for them to evaluate the conditions on base (good faith immunity) or at the very least it was not clearly established that they must do so.

The third case relied on by the majority, *Villanueva v. George*, 659 F.2d 851 (8th Cir.1981), is particularly instructive. Villanueva, a pretrial detainee, was housed in maximum security. The court held that a jury could find that two of the correctional officers, whose duties included day-to-day supervision of plaintiff, could be held liable for failing to remedy the unconstitutional conditions of confinement. The court noted that the district judge properly directed verdicts for the other correctional officers.

> The district court properly directed verdicts for Shannon and George. Since the record clearly establishes that these two individuals were not charged with the personal supervision of the appellant, nor chiefly responsible for the control of inmates at Gumbo, they may not be held legally accountable for the conditions of Villanueva's confinement. An institution may charge certain individuals with the duty to supervise inmates. Moreover, an individual may personally undertake such a duty by his very actions, or a state may statutorily impose such a duty. *See e.g.*, Mo.Ann.Stat.

§ 221.020 (Vernon); *Tatum v. Houser*, 642 F.2d 253, 254 (8th Cir.1981) (Sheriff is responsible for the conditions of confinement in the jails within his county even absent specific knowledge of unconstitutional conduct). Since no duty arose that would obligate Shannon or George to act, their failure to act cannot result in liability.

*Id.* at 855 n. 1. In moving Plaintiff X to base, Graham, Bildner, and Blatter would seem to fall into the category of the officers who were dismissed in *Villanueva.*

None of the other actions of these three defendants recited in Thaddeus X's affidavit would deter a prisoner from filing a lawsuit. Since the defendants filed affidavits denying Thaddeus X's allegations, with the exception of the allegation that they moved him to base, we must look at his affidavit to see if issues of fact remain. Thaddeus X claims Blatter told him that he was being moved because he had filed too many grievances and lawsuits, (¶ 7. of Dec. 5, 1994 affidavit—J.A. at 69), that all defendants refused to pass some legal papers to Bell after Thaddeus X was on base, that when he was placed in the cell on base he asked Bildner, Blatter, and Graham for cleaning supplies and was refused, and that two nurses asked Blatter to move Thaddeus X off base because he should not be with the mentally ill prisoners.

To the extent that telling him the reason for his move would deter him from filing a lawsuit, it would not seem that such a statement, if true, could be made in retaliation for previously filed lawsuits. It should be noted that Thaddeus X at one point filed a motion to dismiss Blatter, which the district court did not grant because the motion was not signed.

Since defendants' affidavits state that it is the responsibility of counselors to transfer and provide legal materials, a fact which Thaddeus X does not controvert in his subsequent affidavit, the refusal of these defendants to perform that service,

**410**

even if in retaliation, would not deter the ordinary prisoner from filing a lawsuit.

Thaddeus X's complaint also alleges that Blatter told him, when he came to move him to base, that he had an authorization to use gas if plaintiff refused to be moved. Advising a prisoner that he had such an authorization would seem to be one of the incidents of prison life to be expected under *Sandin.* Indeed, using gas without telling the prisoner that it was authorized would seem to be the conduct that should be criticized.

I would, therefore, affirm the summary judgments in favor of these three defendants.

With respect to Thaddeus X's claims against Karazim, I concur in Judge Merritt's separate opinion.